UNITED STATES of America,
Plaintiff-Appellee,

v.

John Terrance GARCIA, Phillip G.
Jackman, Defendants-Appellants.

No. 81–5126.

United States Court of Appeals,
Eleventh Circuit.

April 12, 1982.

**1352**

Donald F. Spain, Thomas G. Murray, Miami, Fla., for Jackman.

Ronald A. Dion, Entin, Schwartz, Angert, Dion, & Broudy, Alvin E. Entin, North Miami Beach, Fla., for Garcia.

Linda Collins Hertz, Asst. U. S. Atty., Miami, Fla., Sidney M. Glázer, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before MORGAN, KRAVITCH and HENDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

The major issues raised by this appeal concern the validity of a search by the government of appellants' aircraft. Since we find appellants' challenges to be without merit, we affirm the denial of appellants' suppression motion and appellants' ensuing convictions.

I. *Facts*

At 3:04 p.m. on January 25, 1980, an unidentified aircraft flying toward southeastern Florida crossed the air defense identification zone (ADIZ). The crossing was registered on radar by Air Force personnel who immediately alerted the Homestead Air Force Base near Miami. Within minutes two Air Force planes departed from Homestead to intercept the unidentified aircraft. The Air Force planes were vectored by ground radar to a light twin-engine aircraft, which they intercepted over the ocean about thirty-six nautical miles from Homestead. Major Calvin Hoge, the pilot of the lead plane, testified at trial that he flew by the right side of appellants' plane and observed that it was American, was white with a red stripe, and that no tail number was visible. He followed the aircraft as it flew toward the United States and eventually landed at Rock Harbor Key, Florida. The Air Force planes remained airborne, with Major Hoge circling at an altitude of 7000 feet over the airport where the intercepted craft had landed. Hoge testified that the aircraft was on the ground for a period of five to ten minutes before it began to taxi for take-off. He testified further that he did not observe any person exit or board the plane while it was on the ground and that only one other plane landed while he was circling, though there were other planes already on the ground at the airport.[1] Before appellants' plane departed, a U. S. Customs plane arrived in the vicinity, and Hoge informed its pilot, Douglas Cockes, that the twin-engine plane about to take off was the one he had intercepted. From that point the Customs plane followed appellants' aircraft, and the Air Force planes returned to Homestead.

1. Customs Officer Cockes testified that none of the other planes at the airport had markings similar to those on appellants' plane.

Cockes testified that he followed the aircraft, which he described as a Piper Aztec of light color with red and blue trim, from the airport where it had first landed westward to Sugar Loaf Key where it landed again several minutes later. In the interim, while following the plane and from a point 100–200 yards behind it and 20–30 feet below it in altitude, Cockes observed the emergency exit on the left rear of the plane open and saw someone throw what appeared to be maps and a navigation computer out of the plane. Three dark, wrapped packages were then jettisoned, one of them striking the windshield of the Customs plane. Cockes testified that the packages were about six to eight inches in length and five inches in circumference, and that one of them was "split open" with a "white powdery substance [ ] streaming out of it." Finally, something that appeared to Cockes to be money was ejected from the plane.

Cockes watched the plane land at the end of a road in a mangrove[2] area. He testified that the nearest buildings were about two miles away and that, except for the occupants of one pickup truck driving away from the area when the plane landed, he observed no other people in the vicinity. The Customs plane descended to a point twenty to thirty feet above the ground, and Cockes observed two white males, one without a shirt, exit the aircraft and enter a thicket of mangroves nearby. Meanwhile Cockes had contacted a ground unit of Customs Patrol, which he directed by radio to the area of the landing. He gave the Customs officers a physical description of the two men and advised them that the plane had come from outside the United States. When the officers arrived, Cockes made a "low pass" over the bush area in which he believed the men had gone and then departed from the immediate area to land on a different part of the island.[3] He returned to the mangrove area while the Customs officers were still at the site, and saw the officers emerge from the mangroves with two men who appeared from their clothing to be the same persons he had observed exiting the landed plane.

Testimony by members of the Customs ground patrol crew established that about one and a half hours after the officers began their search they found appellants in the mangrove bushes a quarter of a mile from the aircraft. Appellants were sitting in a hollow area within the bushes that was too low for them to stand in upright. One wore no shirt and had numerous cuts on his chest; the other had cuts on his arms. Both were described as "sweating heavily." According to the officers' testimony and a stipulation entered into by the parties, Customs' search of the plane revealed nine cardboard boxes filled with plastic bags containing methaqualone tablets and weighing a total of 918 pounds.

Appellants were indicted on two counts: conspiracy to possess methaqualone with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846, and possession of methaqualone with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Before trial, appellants moved to suppress the evidence uncovered during the search on the ground that Customs' search of the aircraft was not a valid border search. Appellants also argued that the search was not justifiable on grounds of abandonment because the government had not proved appellants intended to abandon the plane. The district court reserved final ruling on the suppression motion until after trial. A jury found appellants guilty on both counts, and the judge denied appellants' subsequent motion for acquittal.

II. *Border Search*

 It is well established that warrantless searches conducted at the international borders of the United States do not violate

---

**2.** Although the testimony repeatedly refers to the low, dense bushes in which appellants were apprehended as mangroves, one Customs officer testified that they were actually buttonwoods.

**3.** Cockes testified that he did not land the Customs plane at Sugar Loaf Key because its wings, which were larger than those of the Piper Aztec, would have been broken by the mangroves along the road.

the fourth amendment. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). "The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *Id.* at 620, 97 S.Ct. at 1980. The Supreme Court held in *Ramsey* that the reasonableness of such searches derives from "the single fact that the person or item in question ha[s] entered into our country from outside" and therefore is not dependent on the existence of probable cause. *Id.* at 619, 97 S.Ct. at 1980. Although the *Ramsey* Court did not address whether the fourth amendment imposes some lesser standard of suspicion on border searches [4] its reasoning suggests that border searches can be conducted without *any* suspicion of criminal activity, and subsequent Fifth Circuit cases have so held.[5] *E.g., United States v. Sandler*, 644 F.2d 1163 (5th Cir. 1981) (en banc) (reasonable suspicion not required for routine patdown search of international passenger); *United States v. Pringle*, 576 F.2d 1114 (5th Cir. 1978) (warrantless search by Customs of incoming international mail did not violate fourth amendment despite absence of any ground for suspicion).

## A. *Proof of a Border Crossing*

Appellants argue that the search of their aircraft was not a valid border search because the government did not demonstrate with the requisite degree of certainty that the aircraft crossed the United States border. As the Fifth Circuit noted recently in *United States v. Stone*, 659 F.2d 569 (5th Cir. 1981), our prior border search cases have not articulated a consistent standard governing the degree of proof required to establish a border crossing.

Some cases have required evidence demonstrating a high degree of probabili-

ty that the border has been crossed. *United States v. Ivey*, 546 F.2d 139, 142 (5th Cir.), *cert. denied*, 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977); *United States v. Brennan*, 538 F.2d 711, 715 (5th Cir.), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977); *United States v. Adams*, 569 F.2d 924, 925 (5th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (5th Cir. 1978). Others have held that a border crossing must be proved by a preponderance of evidence. *United States v. Johnson*, 588 F.2d [147] at 154; *United States v. Walters*, 591 F.2d 1195, 1198, n.1 (5th Cir.), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979). Still others have ruled that a reasonable suspicion that the border has been crossed suffices. *United States v. Fogelman*, 586 F.2d 337, 343 (5th Cir. 1978).

*United States v. Stone, supra*, 659 F.2d at 573. Comparing the facts in this case to those of the above-cited cases expressing the most stringent standard of proof, we conclude that the evidence here showed with sufficient certainty that the border was crossed.

Appellants rely heavily on *United States v. Brennan, supra*, in which the Fifth Circuit held that Customs agents' search of an aircraft after its landing at the Melbourne Regional Airport in Florida was not a valid border search. The facts of *Brennan* have been summarized as follows:

In *United States v. Brennan, supra*, the airplane which was the subject of the search had never been seen, or known to be, outside the United States. Though it had last been seen flying in a direction that could have led it out of the country, it was not tracked past the Miami, Florida, airport area. It is true that the aircraft was not seen again until sufficient time had elapsed to permit an international flight, and that the Customs Ser-

---

4. In *Ramsey*, the statute authorizing the search, 19 U.S.C. § 482, imposed a reasonable suspicion requirement on searches conducted thereunder, and the Court held that standard had been met. *United States v. Ramsey, supra*, 431 U.S. at 611–14, 97 S.Ct. at 1976–1977.

5. The Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

vice had a tip indicating this aircraft would be involved in smuggling drugs, but these factors were held to be insufficient to establish that the plane had been to a foreign country. Before the border search rationale is applicable, a nexus must be established between a border and the object searched. This essential ingredient was missing in *Brennan.*

*United States v. Ivey, supra,* 546 F.2d at 142 (citations omitted).

In *United States v. Ivey, supra,* the court distinguished *Brennan* and upheld the search of an airplane as a valid border search. In *Ivey* appellants' aircraft, prior to landing in the United States, had last been seen in South Caicos, a small island in the British West Indies. It departed that island at 3:00 p.m. one afternoon with a stated destination of Martinique (another West Indies island) but without filing a flight plan. Customs officials, who apparently had been on the lookout for the plane, were informed of its arrival at a small airport in Florida at 3:00 a.m. the following morning. After the agents checked their computer information system and discovered no record of the plane having cleared Customs anywhere else in the United States during the interim, they proceeded to search the plane. The court held these facts established with "reasonable certainty" that a border crossing had occurred. *United States v. Ivey, supra,* 546 F.2d at 142.

In *United States v. Potter,* 552 F.2d 901 (9th Cir. 1977), also cited by appellants, the Ninth Circuit addressed the degree of proof necessary to establish a border crossing in border-search cases. Although the standard adopted by that court is very stringent[6], it upheld the search at issue as a valid border search. In *Potter,* Customs agents followed a plane from the El Paso International Airport to a point about 150 miles into Mexican air space. They calcu-

lated how long it would take the plane to reach its projected destination in Mexico and return to the United States, and instructed a ground radar unit to be on alert for entering aircraft for a two-hour period during which they expected the aircraft to return. Within the estimated arrival period, the radar unit detected an airplane about fifty miles south of the U. S. border travelling northward within Mexico. No flight plan for the plane had been filed. A Customs plane, guided by the radar unit, followed the aircraft from a point shortly after it crossed the border until it disappeared from the radar screen about one and a half hours later. Within half an hour, an aircraft appeared on radar and identified itself for approach to an airport in Las Vegas. When it landed Customs officers searched it. The Ninth Circuit upheld the search, reasoning that

> [h]ere, although the agents could not have been absolutely certain, we conclude that the totality of the facts and circumstances were sufficient to warrant "a firm belief" in the minds of the customs agents that the aircraft which entered the United States at 3:35 A.M. on October 24 was N224G; that its first stop inside this country was McCarran Airport; and that the marijuana and aircharts discovered must have been aboard when the aircraft crossed the border.

*United States v. Potter, supra,* 552 F.2d at 907.

The evidence of a border crossing in this case is somewhat different in nature than that presented in previous airplane border-search cases. In the above cases, the evidentiary question centered on whether, in the absence of surveillance of a border crossing, such crossing could be inferred from the sighting of the plane at its point of departure within a limited period of time before its arrival in the United States.[7] In

---

**6.** The Ninth Circuit held that there must be "articulable facts to support a reasonably certain conclusion ... that a vessel has crossed the border and entered our [territory]." *United States v. Potter, supra,* 552 F.2d at 907 (quoting from *United States v. Tilton,* 534 F.2d 1363,

1366 (9th Cir. 1976)). The *Potter* court also stated that "reasonable certainty is a higher standard than that of probable cause." *Id.*

**7.** In *Ivey,* the government's evidence indicated the plane had been sighted in a foreign country 13 hours before its arrival at a U. S. airport,

this case, no evidence of appellants' point of departure was introduced. Rather, the evidence of the border crossing was direct. Major Hoge testified that the alert communicated to him by the Air Force radar personnel signified that the airplane to which he was directed, namely appellants' plane, had crossed the air defense identification zone (ADIZ) without having either identified itself or filed a flight plan.[8] More importantly, he testified that he intercepted appellants' plane at a location thirty-six miles southeast of Homestead, which point he designated on a map for the court. Appellants argue that the government did not present evidence that this point was outside the U. S. border and hence did not sustain its burden of proof on the border-crossing issue. The trial judge was free to take judicial notice of the fact[9] that the point

and the court allowed an inference of its having crossed the border. *See United States v. Ivey, supra,* 546 F.2d at 142–43. In *Brennan,* the plane departed from one U. S. airport and landed at another; the court refused to infer a border crossing from the lapse of time between the plane's departure and subsequent landing notwithstanding an informant's tip that the plane was involved in drug smuggling activities. *See United States v. Brennan, supra,* 538 F.2d at 713–15.

8. Hoge stated on direct examination that his air defense unit is alerted when ADIZ is crossed by an unidentified aircraft and that no alert is given if the line is not crossed. Record, Vol. 1, at 27–28. On cross examination, he was somewhat more equivocal, stating that this was his understanding of how the air defense operation functions although he was "not totally knowledgeable." *Id.* at 44. We need not decide whether this testimony alone would have been sufficient to establish a border crossing with "reasonable certainty," since Hoge's interception of appellants' plane outside the U. S. border and continuous visual surveillance of it thereafter until it entered this country clearly prove that it crossed the border. See text *infra.*

9. Fed.R.Evid. 201(b), (d). Ordinarily, when a judge takes judicial notice of a fact other than at the request of a party (i.e. "discretionary judicial notice"), he should notify the parties that he is doing so and afford them an opportunity to be heard. C. Wright & K. Graham, 21 Federal Practice and Procedure § 5107, at 507 (1977). Indeed, where failure to do so deprives an accused in a criminal trial of knowledge of the evidence on which he is being convicted and of an opportunity to challenge the facts relied on, due process requires that the defendant be informed. *Garner v. Louisiana,* 368 U.S. 157, 173–74, 82 S.Ct. 248, 256–257, 7 L.Ed.2d 207 (1961). Here, however, appellants clearly had notice that the border-crossing question was in issue and that the government was relying on the piercing of ADIZ and the interception of appellants' plane 36 miles from Homestead (coupled with Hoge's visual surveillance of the plane thereafter) to prove that a border crossing had occurred. The testimony as to these facts, the map used by the govern-

ment as demonstrative evidence, and the arguments presented by the government made clear the nature of the evidence on which it was relying. See especially Record, Vol. 2, at 159:

> PROSECUTING ATTORNEY: ... All we have to show is that he made a border crossing and that that [sic] has been firmly established by the evidence of the two pilots. They got to the plane, I believe he said they first made contact 40 miles out to sea.
>
> No way under any international theory of law is 40 miles at sea within the territorial United States.

Moreover, the trial court made clear it was drawing from the government's evidence the inference that the plane crossed the territorial border:

> COURT: ... the thing I am asking now, you certainly, we are simply dwelling on whether or not they have to show this thing came from foreign, from international waters into Customs waters or territorial waters.
>
> Now, we know that the aircraft came from territorial waters into the Customs waters [sic]. We know that. That is obvious.

Record, Vol. 3, at 173. Finally, appellant Jackman's own counsel in essence requested that the court judicially notice that the point of interception was outside the U. S. border, though in a rather indirect way:

> PROSECUTING ATTORNEY: ... All we have to know is there was a border crossing and a border crossing is exactly what it says, the border to the United States was crossed, and it was.
>
> THE COURT: That means from territorial waters into the Customs waters [sic]?
>
> PROSECUTING ATTORNEY: It means the border.
>
> The phrase, I think, Judge, the way I have seen the cases, doesn't have an exact definition.
>
> Miami International Airport is considered a border for some things, just means that at some point the plane came into the United States from outside the United States.
>
> DEFENSE ATTORNEY: Your Honor, let me just point out to the Court that, I don't know whether this Judge and his entourage flew down here or not, but I point out that *every aircraft that goes from Key West to Miami*

described by Major Hoge was well beyond the three-mile territorial limit that has been recognized as the border of the United States for purposes of ocean border-crossing cases.[10] Hence, we hold that the government established with reasonable certainty that appellants' plane crossed the U. S. border.

Appellants contend that even if a border crossing was established the government must prove that the flight originated in a foreign country. We find this argument to be without merit. In *United States v. Stone, supra,* 659 F.2d 569, a Fifth Circuit panel declined to require proof by the government that an entering craft has left foreign land in order to justify a search under the border-search rationale once a border crossing had been established. *Id.* at 573. In *Stone,* the defendant's plane had been monitored from a point over foreign airspace until its entry into the United States and landing at the Orlando International Airport. The plane had first been sighted in the vicinity of a reported near mid-air collision over the Andros Islands, and its identity as the plane involved in that incident was corroborated by its damaged condition as observed by government officials after its arrival. Thus, although the panel required no further proof that the plane's point of origin was foreign, the government's evidence in *Stone* reasonably supported an inference that the aircraft's origin was other than in the United States.

The broad language of *Stone* suggests that the question of point of origin has no bearing on the reasonableness of a search so long as a border crossing has been established.[11] We would not be prepared to uphold as a border search, however, a search of an aircraft whose *known* points of origin and landing were within the United States simply by virtue of the fact that the plane had passed over international waters en route. Many domestic flights necessarily transgress the boundaries between national and international airspace in travelling the most direct route between point of origin and destination. A flight from New Orleans to Miami is an obvious example, as is one from San Francisco to Honolulu. Yet there is no more justification for searching the aircraft or passengers who make such flights than there would be for searching those whose domestic flights do

---

*flies through international waters and crosses the border, whether you are going to Miami or coming back to Key West and is a border crossing, not in the legal sense but they cross the boundaries of the United States and I ask the Court to take judicial notice of that fact.*

THE COURT: All right, sir.

**10.** In boat-search cases, we have treated the three-mile limit, which separates what is commonly referred to as "territorial waters" from what is known as "customs waters" or the "contiguous zone," as the border of the United States. *See United States v. McPherson,* 664 F.2d 69, 72 (5th Cir. 1981); *United States v. Whitmire,* 595 F.2d 1303, 1307 (5th Cir. 1979). This boundary is consistent with the government's exercise of sovereignty, which extends over territorial but not customs waters. *Note, High On the Seas: Drug Smuggling, the Fourth Amendment, and Warrantless Searches at Sea,* 93 Harv.L.Rev. 725 n.2 (1980). Although we have suggested that customs waters, which extend from the three-mile limit seaward to a point twelve miles offshore, may be considered the "functional equivalent" of the border, *see id.* (citing *United States v. Williams,* 617 F.2d 1063, 1095–96 (5th Cir. 1980) (en banc) (Rubin, J., concurring)), thus enabling Customs to search vessels within that area, this does not mean we intend to treat the twelve-mile limit as the border for border-crossing purposes; it simply indicates the degree of proximity to the actual border (i.e. the three-mile boundary) within which the conveyance must be at the time it is searched.

**11.** The *Stone* panel declared:

The appellant, however, would have the court apply a different standard. He would require that, in order to establish a valid border search, the government must demonstrate not only that a border has been crossed but, additionally, that the entering craft has left foreign land. Such an added requirement, however, is tenable neither in law nor in logic. In no case has a border search been invalidated because the object's departure from foreign soil was not demonstrated. Instead, a legion of cases have made clear that the propriety of an extended border search rests on the "critical fact" of whether or not a border crossing has occurred.

*United States v. Stone, supra,* 659 F.2d at 573 (citations omitted).

not happen to take them over the ocean on the way. Unlike boats, which may rendevous with foreign vessels and take on illegal passengers or cargo while in international waters, planes that pass through international airspace do not present any possibility of foreign contacts other than that presented by their actual stopping in a foreign country.[12] Hence the question of proof of a border crossing in the context of an airplane search, contrary to the dicta in *Stone*, cannot be wholly divorced from the issue of the plane's point of origin. Rather, the proof of the crossing must be viewed together with the other evidence to determine whether there was a substantial likelihood that the plane has come from a foreign location.

■■■■ If the plane were a domestic commercial carrier whose point of origin could readily be ascertained by law enforcement officials through airline and air traffic control records, clearly the sole fact of a crossing through international airspace would not provide an inference that the plane had a foreign point of origin. Similarly, a private aircraft whose flight plan, having been filed in accordance with federal regulations, indicated a domestic point of origin would not be subject to a border search absent some showing that the plane had deviated from its stated course. Where, as here, however, the plane in question is shown to have pierced the air defense identification zone travelling from the southeast toward this country without having filed a flight plan or notifying U. S. government officials of its pending arrival as required by federal law, the government is entitled to draw the inference that its point of origin was foreign and accordingly to conduct a search of the plane without a warrant or any suspicion of criminal activity. The border search

cases clearly establish that the government's interest in controlling "who and what may enter the country" outweighs the privacy interests of those who choose to travel to the United States. *United States v. Ramsey, supra*, 431 U.S. at 610, 97 S.Ct. at 1975. Moreover, federal regulations impose on entering aircraft a duty to identify themselves and to inform the government of their origin and intended destination.[13] A plane that crosses the border without complying with these requirements may not create a fourth amendment privacy interest by refusing to show the government that its point of origin was not foreign. If it came from outside the United States it has no fourth amendment immunity from a warrantless search; if its origin was domestic the government has provided a method by which that fact may be established, and one who fails to comply with that procedure is estopped from asserting a domestic point of origin after landing in this country.

### B. *Location of Search*

Appellants' second basis for objecting to the search of their plane is that, even if a border crossing was established, the search was not valid as a border search because it was not conducted at the border or its functional equivalent. The Supreme Court gave birth to the "functional equivalent of the border" concept in *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), in which it made a brief, unexplained statement of the doctrine and then held it inapplicable in that case. *Almeida-Sanchez* involved a warrantless search of an automobile by a roving band of the U. S. Border Patrol on an east-west highway located "at all points at least 20 miles north of the Mexican border." *Id.* at 268, 273, 93 S.Ct. at 2537, 2539. The

---

12. Because the boat search cases are thus distinguishable, the holding in *United States v. McPherson*, 664 F.2d 69, 70 (5th Cir. 1981) that proof of foreign contact is not required for a border search of a vessel is inapplicable in the airplane search context. Although *McPherson* relied on *United States v. Stone, supra*, which involved an airplane search, we decline to adopt the broad language of *Stone* to extend its holding beyond the facts of that case. We

follow *Stone*, however, to the extent it held no further proof of foreign origin is required where an unidentified aircraft crosses the United States border.

13. 19 C.F.R. §§ 6.2, 6.14 (1981). *See United States v. Ivey*, 546 F.2d 139, 142 (5th Cir.), *cert. denied*, 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977).

search had been conducted with neither suspicion of criminal activity nor any evidence that the subject vehicle had crossed the border. *Id.* at 268, 93 S.Ct. at 2537. After holding that the search did not fall within prior precedents applying relaxed fourth amendment standards to certain administrative inspections, the Court considered whether the statute authorizing the search could be upheld under the border-search rationale because it purported to authorize such searches "within a reasonable distance from any external boundary of the United States." *Id.* at 272, 93 S.Ct. at 2539. The Court noted that "[w]hatever the permissible scope of intrusiveness of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well." *Id.* Justice Stewart, writing for the Court, did not elaborate on what constitutes the "functional equivalent" of the border, however, beyond giving two examples and holding the doctrine inapplicable in the case before the Court.

> [S]earches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.
>
> But the search of the petitioner's automobile by a roving patrol, on a California road that lies at all points at least 20 miles north of the Mexican border, was of a wholly different sort. In the absence of probable cause or consent, that search violated the petitioner's Fourth Amendment right to be free of "unreasonable searches and seizures."

*Id.* at 272–73, 93 S.Ct. at 2539 (footnote omitted).

In a subsequent line of cases all involving Border Patrol stops but with slight factual variations, the Court again considered the constitutionality of vehicle stops conducted within U. S. borders. In *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court held that reasonable suspicion was required before roving Border Patrol officers could stop vehicles for questioning at points inside the U. S. border. In *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), it held that probable cause was required for full-scale searches conducted at permanent checkpoints within the border. Finally, in *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court upheld brief warrantless stops of vehicles at permanent checkpoints absent any suspicion that the particular vehicles contained illegal aliens. The Court did not apply the functional-equivalent theory in these cases; in fact, it avoided the border-search doctrine altogether.[14] Instead, it considered the "formidable law enforcement problems" of the Border Patrol in attempting to control the flow of illegal aliens into this country, and balanced this governmental interest against the degree of interference with individuals' fourth

---

14. The Court did not rely on the border-search doctrine, despite Justice Stewart's suggestion in *Almeida-Sanchez* that searches at "established checkpoints" would come within the rubric of the functional equivalent of the border. See text *supra*. Apparently, it was the distance of the Border Patrol checkpoints from the Mexican border that dissuaded the Court from applying the border-search rationale. In *Ortiz* and *Brignoni-Ponce*, the checkpoint search and roving patrol stop, respectively, occurred about 60 miles north of the Mexican border, and the Court made it clear that it considered that location "removed from the border and its functional equivalents." *United States v. Ortiz, supra*, 422 U.S. at 892, 896, 95 S.Ct. at 2586– 2588; *United States v. Brignoni-Ponce, supra*, 422 U.S. at 874–75, 95 S.Ct. at 2576–2577. The stops in *Martinez-Fuerte, supra*, occurred at similar distances, and in that case the Court made no reference to the functional-equivalent-of-the-border theory. The Court's unwillingness to apply the functional-equivalent theory in these cases may also have been influenced in part by the fact that the statute governing the Border Patrol activities in these cases had been interpreted by the agency in its administrative regulations to authorize vehicle inspections "anywhere within 100 air miles of the border." *See United States v. Brignoni-Ponce, supra*, 422 U.S. at 882–83, 95 S.Ct. at 2580–2581.

amendment rights caused by the stop or search procedure at issue in each case. *See United States v. Martinez-Fuerte, supra*, 428 U.S. at 552, 557–58, 96 S.Ct. at 3080, 3082–3083; *United States v. Brignoni-Ponce, supra*, 422 U.S. at 879–80, 95 S.Ct. at 2579; *United States v. Ortiz, supra*, 422 U.S. at 894–97, 95 S.Ct. at 2587–2589.[15]

Expounding on the Supreme Court's analyses in *Almeida-Sanchez* and *Martinez-Fuerte* the Fifth Circuit, in *United States v. Brennan, supra*, 538 F.2d 711, considered the functional-equivalent-of-the-border theory in a case involving an airplane search. The court attempted to draw from the *Almeida-Sanchez* Court's examples the implicit reasoning underlying the theory and a test for determining its applicability in particular cases. The court concluded that the critical factors for establishing that a search took place at the functional equivalent of the border were (1) "a high degree of probability that a border crossing took place" and (2) "an attendant likelihood that nothing about the object of the search has changed since the crossing."[16] The court found those criteria had not been met in the case before it because neither the facts concerning appellant's flight nor the character or procedures at the airport "furnish[ed] any reliable indication that Brennan's flight was international." *Id.* at 715. The *Bren-*

nan panel did not stop with an analysis of the *Almeida-Sanchez* examples in defining the functional equivalent of the border, however. In addition, it considered the Supreme Court's decision in *United States v. Martinez-Fuerte, supra*, and held that the "regularity factor" emphasized in *Martinez*[17] would also support a search as one occurring at the functional equivalent of the border. Such factor would be established where

[t]he intrusion is minimal, the existence and function of the checkpoint is known to the citizen in advance of his entry into its lanes, there is little discretionary enforcement activity, and the results of the checking procedure may be reviewed by the courts without distortion of the issue of reasonableness by hindsight knowledge that the search produced the desired fruits, if any, of the stop or search.

*United States v. Brennan, supra*, 538 F.2d at 715–16 (citing *United States v. Martinez-Fuerte, supra*, 428 U.S. at 558–59, 96 S.Ct. at 3083).[18]

The *Brennan* panel used the "functional equivalent of the border" language loosely to refer both to searches of conveyances that have actually crossed the border and to searches within the administrative-stop rationale employed by the Supreme Court in

---

**15.** In *Martinez-Fuerte*, the Court upheld a stop conducted at a permanent internal checkpoint because the detention was brief and limited in scope (less than a full search), the interference with legitimate traffic was minimal because motorists knew in advance of the location of the checkpoints, and the "regularized manner" in which the checkpoints were operated involved less discretionary enforcement activity than did roving patrol stops. *United States v. Martinez-Fuerte, supra*, 428 U.S. at 558–59, 96 S.Ct. at 3083.

**16.** As the *Brennan* court pointed out, both these requirements are clearly met in the non-stop international flight example, whereas their fulfillment in the internal traffic checkpoint context will depend on the location of the checkpoint and the screening procedures used to determine which automobiles are searched. *United States v. Brennan, supra*, 538 F.2d at 713.

**17.** See note 15 *supra*.

**18.** With regard to the regularity factor, the *Brennan* court concluded it was not met in that case because:

the operation here involved a full search, was not anticipated by the subject, involved discretionary decisions at several levels of authority, and was so particularized to the suspicions of defendant's activities that the success of the search clearly cast an aura of reasonableness on the encounter itself. In sum, this search did not possess the characteristics of a border search or other regular inspection procedures. It more resembled the common nonborder search based on individualized suspicion, which must be prefaced by the usual warrant and probable cause standards, unless the authority of the searching officials is not controlled by *Almeida-Sanchez*.

*United States v. Brennan, supra*, 538 F.2d at 715–16.

the Border-Patrol cases.[19] As noted above, however, the theory developed by the Supreme Court in the Border-Patrol cases is conceptually distinct from the traditional border-search doctrine and its extensions. A warrantless search, whether conducted at the actual border or elsewhere, is justifiable as a border search only where the government shows with reasonable certainty that the person or object searched has crossed the border.[20] The Border-Patrol cases, by contrast, require no individualized determination that the object searched has crossed the border.[21] Instead, the special law enforcement problems of patrolling the U. S. border and the "regularity" of certain Border Patrol detentions, which minimizes their interference with privacy, were held to justify the Border-Patrol stops in a context *other* than the border-search situation, i.e. in cases where the Court did not find that the requirements for a border search (or its functional equivalent) had been met. See note 14 and accompanying text *supra.* Neither the Border-Patrol cases nor the *Brennan* decision [22] should be read as imposing additional limitations on searches made at the border or its functional equivalents. Rather, those cases establish an independent rationale and standards applicable only to searches that do not qualify as border or functional-equivalent searches.

Fifth Circuit cases subsequent to *Brennan* have upheld searches following a bor-

**19.** The confusion in language can be directly traced to Justice Stewart's examples in *Almeida-Sanchez* of functional-equivalent-of-the-border situations, which included a permanent checkpoint within the border. See text *supra* at 13. As noted above, however, the Supreme Court in subsequent cases chose not to apply the functional-equivalent standard, either in language or in theory, to the subsequent Border-Patrol cases. See note 14 and accompanying text *supra.*

**20.** This requirement is met both in an ordinary border search and a search at the functional equivalent. The only difference between the two is that the "functional equivalent" search takes place at a location beyond the physical border and is permitted because the subject of the search is known to have remained unaltered from the time of its crossing through the period before it is searched.

**21.** The proximity of the detention's location to the physical border is relevant in such cases because the governmental interest justifying relaxation of the fourth amendment probable cause and warrant requirements is that of regulating the flow of aliens into the United States. *See, e.g., United States v. Martinez-Fuerte, supra,* 428 U.S. at 552–54, 96 S.Ct. at 3080–3081. Obviously, this interest would not be sufficiently strong to justify warrantless searches at a location so far from the border that only a negligible percentage of the vehicles passing through might reasonably be expected to have come from a foreign location. The likelihood that vehicles passing through a detention area have come from across the border may thus bear on the validity of such checkpoint stops; however, the inquiry in such cases, unlike in the true border-search context, is one of general probabilities rather than particularized suspicion.

**22.** The *Brennan* panel did not hold that *both* proof of a border crossing *and* the *Martinez-Fuerte* regularity factors are required for a search to be considered one at the functional equivalent of the border. It found neither of these requirements satisfied in the case before it and for that reason held the search was not at the functional equivalent of the border. *See United States v. Brennan, supra,* 538 F.2d at 715–16. The court did not clearly state whether the requirements were cumulative or alternative. Its concluding statement that "this search did not possess the characteristics of a border search *or* other regular inspection procedures," *id.* at 716 (emphasis added), however, suggests that it viewed them as alternative. Although for the reasons just stated, we interpret *Brennan* as describing two separate tests for determining whether a search is one at the "functional equivalent of the border," some later cases have suggested a contrary interpretation. In *United States v. Whitmire,* 595 F.2d 1303 (5th Cir. 1979), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980), the court described *Brennan* as holding that the functional equivalent of the border requires "(1) a 'high degree of probability that a border crossing took place' *and* (2) a regularity to the intrusion." *Id.* at 1307 n.2 (emphasis added). The *Whitmire* court noted that cases subsequent to *Brennan* have not required both these elements and concluded that *Brennan's* "full implications" had not been followed. *Id. See also United States v. Sheikh,* 654 F.2d 1057, 1068–70 (5th Cir. 1981). The *Whitmire* panel itself treated the Border-Patrol stop cases as a separate potential basis for upholding a warrantless search. *See United States v. Whitmire, supra,* 595 F.2d at 1308. However one interprets the *Brennan* decision, it is clear that the current state of the law in the Fifth Circuit views the border-crossing and regularity requirements as alternative and not cumulative. See text *infra.*

der crossing, whether at the actual border or elsewhere, without regard to the regularity of conducting searches at the particular site involved. *E.g., United States v. Pringle*, 576 F.2d 1114, 1116–18 (5th Cir. 1978) (search of international mail at port of entry reasonable under fourth amendment simply because mail has crossed border); *United States v. Ivey*, 546 F.2d 139 (5th Cir.), *cert. denied*, 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977) (Customs search of aircraft at small airport after border crossing upheld). Other cases have upheld searches removed from the border without proof of a border crossing where the regularity factors of the Supreme Court's Border Patrol cases are met. *E.g., United States v. Reyna*, 572 F.2d 515 (5th Cir.), *cert. denied*, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978); *United States v. Alvarez-Gonzalez*, 542 F.2d 226 (5th Cir. 1976), *appeal after remand*, 561 F.2d 620 (5th Cir. 1977). The holdings of these cases in substance have kept the border-search and Border-Patrol theories and their respective border-crossing and regularity requirements distinct. *But cf. United States v. Sheikh*, 654 F.2d 1057, 1068–70 (5th Cir. 1981) (applying both border-crossing and regularity requirements to search of international mail). What has remained confused after *Brennan* is the language used by the court. Both types of searches repeatedly have been referred to as "functional equivalent of the border" searches. Rather than recognizing that two different theories are being employed, the cases have tended to rely on those prior decisions the facts of which most closely parallel their own and to

distinguish the others on a variety of bases. An additional source of confusion in our border-search cases is the "extended border search" terminology, which sometimes is used interchangeably with "functional equivalent of the border" but other times has been conceived as a variation of the latter with different fourth amendment requirements.[23] *Compare United States v. Johnson*, 588 F.2d 147, 154 n.11 (5th Cir. 1979) (difference between "extended border search" and "functional equivalent of a search at the border" is merely "semantic") *with United States v. Richards*, 638 F.2d 765, 771–72 & n.4 (5th Cir. 1981) (extended border searches, unlike searches at border or functional equivalent, require reasonable suspicion of criminal activity because they usually occur after initial, routine search and involve greater invasion of privacy).

Ignoring, for the moment, the vagaries of language in the cases and looking to the substance of Fifth Circuit precedents, we discern three separate bases for upholding a warrantless search conducted somewhere in the vicinity of the border. First, there are the two already described. The limited stop at a permanent facility relatively near the border is justified under the rule of *Martinez-Fuerte* where practically necessary to control the flow of persons and objects into this country. A detention authorized under this theory requires no showing that the vehicle or item detained actually crossed the border, so long as the location of the detention and its scope are such as to ensure that it is necessary for controlling

---

**23.** *United States v. Johnson*, 588 F.2d 147 (5th Cir. 1979) attempted to clarify the precedents by recognizing that the functional equivalent of the border has "two meanings":

A particular place removed from the border may be the functional equivalent of the border because of its physical characteristics and the nature of the traffic flowing through it. *E.g., United States v. Reyna*, 572 F.2d 515 (5th Cir. 1978); *United States v. Alvarez-Gonzalez*, 542 F.2d 226 (5th Cir. 1976). Also, a particular *search* may be the functional equivalent of a search at the border if the object of the search has been kept under constant surveillance from the border to the point of search. *See, e.g., United States v.*

*Fogelman*, 586 F.2d 337, 342–345 (5th Cir. 1978).

*Id.* at 154. The first meaning clearly refers to the Border-Patrol type search upheld in *Martinez-Fuerte*. The latter describes searches that, although following a border crossing, are conducted at a point within the country. Despite the *Johnson* panel's laudable effort to categorize the various analyses employed by panels of the Fifth Circuit under the "functional equivalent of the border" rubric, the area has remained confused largely because one phrase—functional equivalent of the border—has continued to be applied to three very different legal theories, without full recognition of that fact.

traffic across the border and that its intrusion on the privacy of those lawfully in the country is limited. *See United States v. Martinez-Fuerte, supra,* 428 U.S. at 556–64, 96 S.Ct. at 3082–3085; *United States v. Ortiz, supra,* 422 U.S. at 893–97, 95 S.Ct. at 2587–2589. Fifth Circuit progeny of the Supreme Court Border-Patrol cases are exemplified by *United States v. Reyna,* 572 F.2d 515 (5th Cir.), *cert. denied,* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978); *United States v. Alvarez-Gonzalez,* 542 F.2d 226 (5th Cir. 1976), *affirmed after remand,*

561 F.2d 620 (5th Cir. 1977); *United States v. Hart,* 506 F.2d 887 (5th Cir.), *vacated and remanded,* 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 (1975), *reaffirmed,* 525 F.2d 1199 (5th Cir.), *cert. denied,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976).[24]

■ A search within the border may also be justified as a border search requiring no warrant nor any suspicion if there is reasonable certainty that the object or person searched has just crossed the border, there has been no time or opportunity for

---

**24.** The Fifth Circuit panels in *Hart* and *Alvarez-Gonzalez* upheld full-scale searches at permanent checkpoints despite the Supreme Court's holding in *Ortiz* that a search required probable cause and Court's reliance in *Martinez-Fuerte* on the limited scope of the stop in upholding a checkpoint. detention. (See text *supra* at 859–860.) The panels distinguished *Ortiz* and *Martinez-Fuerte* by holding that those cases did not affect checkpoints that are "functionally equivalent to the border." *United States v. Alvarez-Gonzalez, supra,* 542 F.2d at 227–28; *United States v. Hart, supra,* 525 F.2d at 1200. The locations of the checkpoint facilities in *Hart* and *Alvarez-Gonzalez* were respectively about 20 and 42 miles from the Mexican border, *United States v. Hart, supra,* 506 F.2d at 896; *United States v. Alvarez-Gonzalez, supra,* 542 F.2d at 227, whereas those in *Ortiz* and *Martinez-Fuerte* were about 60 miles from the border, see note 14 *supra.* The basis for the *Hart* and *Alvarez-Gonzalez* holdings that the particular checkpoints were functional equivalents of the border was not the closer proximity between the checkpoint and the border, however, but rather a group of factors including the permanence of the facilities, the ratio of international to domestic traffic passing through them, the uncontrolled access from the border to the area that the facility controls, and the apprehension at the facility of significant numbers of illegal aliens. *See United States v. Alvarez-Gonzalez, supra,* 542 F.2d at 228–29. *Hart* and *Alvarez-Gonzalez* thus purport to distinguish the Supreme Court's Border-Patrol cases by applying the functional equivalent rationale in order to avoid the limits imposed by the Supreme Court on the scope of checkpoint searches. Nonetheless, it is clear that the basic reason for allowing warrantless, suspicionless searches in these cases is the same; both the Fifth Circuit and the Supreme Court holdings were grounded in the need for internal checkpoints to police the flow of traffic across the border and the limited interference with the domestic traffic in conducting stops or searches at such facilities. Despite the "functional equivalent" terminology in which the *Hart* and *Alvarez-Gonzalez* decisions were

couched, these cases do not involve border searches in the traditional sense of that term because they require no showing that the vehicle searched actually crossed the border. Since *Hart* and *Alvarez-Gonzalez* there has been a flood of litigation in this area of fourth amendment law. Recent Fifth Circuit checkpoint cases include *United States v. Abrams,* 598 F.2d 969 (5th Cir. 1979); *United States v. Smith,* 598 F.2d 936 (5th Cir. 1979) (warrantless search conducted two and one half hours after arrest made on basis of informants' tips required probable cause despite its occurrence at border checkpoint facility); *United States v. Richards,* 598 F.2d 463 (5th Cir. 1979); *United States v. Luddington,* 589 F.2d 236 (5th Cir. 1979); *United States v. Bender,* 588 F.2d 200 (5th Cir. 1979); *United States v. Clay,* 581 F.2d 1190 (5th Cir. 1978); *United States v. Moreno,* 579 F.2d 371 (5th Cir. 1978); *United States v. Fontecha,* 576 F.2d 601 (5th Cir. 1978); *United States v. Arrendondo-Hernandez,* 574 F.2d 1312 (5th Cir. 1978); *United States v. Woody,* 567 F.2d 1353 (5th Cir. 1978); *United States v. Robinson,* 567 F.2d 637 (5th Cir. 1978); *United States v. Blanford,* 566 F.2d 470 (5th Cir. 1978); *United States v. Morris,* 565 F.2d 951 (5th Cir. 1978); *United States v. Legeza,* 559 F.2d 441 (5th Cir. 1977); *United States v. Canales,* 558 F.2d 1201 (5th Cir. 1977); *United States v. Rodriquez,* 556 F.2d 277 (5th Cir. 1977); *United States v. Wilson,* 553 F.2d 896 (5th Cir. 1977); *United States v. Faulkner,* 547 F.2d 870 (5th Cir. 1977); *United States v. Macias,* 546 F.2d 58 (5th Cir. 1977). *See also United States v. Saenz,* 578 F.2d 643 (5th Cir. 1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979) (roving Border Patrol officers must have reasonable suspicion to search vehicle); *United States v. DeWitt,* 569 F.2d 1338 (5th Cir. 1978) (same); *United States v. George,* 567 F.2d 643 (5th Cir. 1978); *United States v. Villarreal,* 565 F.2d 932 (5th Cir. 1978); *United States v. Lopez,* 564 F.2d 710 (5th Cir. 1977); *United States v. Escamilla,* 560 F.2d 1229 (5th Cir. 1977); *United States v. Barnard,* 553 F.2d 389 (5th Cir. 1977); *United States v. Frisbie,* 550 F.2d 335 (5th Cir. 1977).

the object to have changed materially since the time of crossing, and the search is conducted at the earliest practicable point after the border was crossed. Justice Stewart's example of the search of an aircraft at its first point of landing in the United States after an international flight is the paradigm example of this type of search. *Almeida-Sanchez v. United States, supra,* 413 U.S. at 272, 93 S.Ct. at 2539. This type of search is justified under the border-search doctrine because it is in essence no different than a search conducted at the border; the reason for allowing such a search to take place other than at the actual physical border is the practical impossibility of requiring the subject searched to stop at the physical border. The government's interest in controlling the flow of persons and objects across its borders is no less vital with respect to conveyances that cannot practically be detained at the physical border than with those that can. Our cases allowing searches of aircraft at their first landing point following international flights, *e.g., United States v. Stone,* 659 F.2d 569 (5th Cir. 1981); . *United States v. Ivey, supra; United States v. Klein,* 592 F.2d 909 (5th Cir. 1979), searches of ships that have entered territorial waters conducted either within the territorial waters, *see United States v. Williams, supra,* 617 F.2d at 1096 (Rubin, J., specially concurring), or at the port where the ship first docks, *United States v. Prince,* 491 F.2d 655 (5th Cir. 1974), and searches of international mail at its port of entry, *United States v. Pringle,* 576 F.2d 1114 (5th Cir. 1978), fall within this category. *See also United States v. Adams,* 569 F.2d 924 (5th Cir.), cert. denied, 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (1978) (search of vehicle in National Park upheld on high probability it had just come into United States by crossing Rio Grande River). *But cf. United States v. Whitmire,* 595 F.2d 1303 (5th Cir. 1979) (search of ship at port not justifiable as border search where officers observed it only within U. S. waters).

█ Finally, we have allowed searches conducted within the border even after the first practicable detention point where sup-ported by reasonable suspicion. The rationale for these cases, which sometimes use the "extended border search" terminology, is grounded in part on the fact that the border has been crossed and additionally on the special need of law enforcement officials to defer apprehension of those suspected of being engaged in illegal smuggling activities in circumstances where surveillance may lead them to "'higher ups' or other cohorts" in the illegal enterprise, *United States v. Fogelman,* 586 F.2d 337, 348 (5th Cir. 1978), or to further evidence of the criminal activity. Such searches require reasonable certainty that a border crossing has occurred and that conditions have remained unchanged from the crossing until the search. *United States v. Richards, supra,* 638 F.2d at 772. Because searches so delayed may involve a greater invasion of privacy than searches at the border or first practicable detention point, however, they may be conducted without a warrant only if supported by reasonable suspicion. *Id.* n.4. Examples of this last category of search are *United States v. Richards, supra* (second search of package sent via international mail after defendant had claimed it from post office); *United States v. Kenney,* 601 F.2d 211 (5th Cir. 1979) (search of defendant's vehicle following observation of his crossing border at unstaffed point of entry on Rio Grande River and loading of vehicle with sacks reasonably suspected to contain marijuana); *United States v. Walters,* 591 F.2d 1195 (5th Cir.), cert. denied, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979) (strip search of international passenger while still in airport fifty-five minutes after she passed through Customs enclosure); *United States v. Fogelman, supra* (search of truck following continuous surveillance after being loaded from ship that had crossed border); *Government of Canal Zone v. Eulberg,* 581 F.2d 1216 (5th Cir. 1978) (second search of vehicle offloaded from vessel arriving from Peru after initial inspection revealing contraband and following surveillance period during which appellant claimed vehicle from Customs); *United States v. Martinez,* 577 F.2d 960 (5th Cir.), cert. de-

*nied,* 439 U.S. 914, 99 S.Ct. 288, 58 L.Ed.2d 262 (1978) (second search of international passengers' luggage after following passengers to airport parking lot where initial Customs probe had revealed cocaine in luggage). *But cf. United States v. Johnson, supra,* 588 F.2d 147 (search of duffle bag not justifiable as extended border search after surveillance of defendants following border crossing where officers had no reason to believe bag or its contents had crossed border).

 The overlapping and inconsistent usage of the "functional equivalent of the border" language in our cases has cloaked this area of the law with an unnecessary complexity. For this reason, we now adopt a terminology for use in future cases that will eliminate the confusion. First, we decline to follow prior decisions in using the "functional equivalent" language to refer to Border Patrol or other checkpoint searches. These searches do not fit within the traditional definition of a border search, which refers to searches of persons, conveyances, or objects that have come into the United States from outside. *See United States v. Ramsey, supra,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–1980, 52 L.Ed.2d 617. As we have already noted, checkpoint searches do not require that the object of the search have crossed the border. We thus choose to refer to such searches simply as "checkpoint searches" and not as searches at the "functional equivalent of the border." [25] We view the "functional equivalent of the border" language as peculiarly appropriate to describe those searches that, although not conducted at the actual physical border, take place after a border crossing at the first practicable detention point. Such searches are truly border searches because their sole justification is the fact that the border has been crossed. Because the person, conveyance, or object is searched at the first place where it comes to rest within the country, it can truly be considered as having "br[ought] the border with it." *United States v. Brennan, supra,* 538 F.2d at 715. Whether as a matter of the sovereign's grace or of the practical impossibility of stopping every entering person or object at the physical border such person or object is allowed to proceed to a point on the interior, "the critical fact" that the border has been crossed [26] remains unchanged. Moreover, the resumed expectation of privacy that generally accompanies one's assimilation into the mainstream of domestic activities has not yet developed when the search is conducted at the first practicable stopping point. *Cf. United States v. Walters, supra,* 591 F.2d at 1198 (degree of assimilation into domestic activities relevant in assessing reasonableness of extended border search). For these reasons, a search at such location can logically be considered as taking place at a function-

**25.** The rationale for checkpoint stops is similar to that for other suspicionless searches sometimes referred to as "administrative" or "regulatory" searches. The Supreme Court has upheld such inspections in situations where requiring a warrant or probable cause would prevent effective enforcement of a regulatory scheme and where the nature or scope of the inspection ensures minimal invasion of legitimate privacy interests. *See, e.g., United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (unannounced inspection of business premises for compliance with federal firearms storage requirements); *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (scheduled home visit by caseworker under State Aid to Families with Dependent Children Program); *United States v. Davis,* 482 F.2d 893 (9th Cir. 1973) (airport screening searches of passengers and carry-on luggage for weapons and explosives). *But cf. Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (search of employment facility for compliance with Occupational Safety and Health Act requires warrant); *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (entry to fight fire and remaining for reasonable investigation of cause requires no warrant, but subsequent reentries to investigate suspected arson governed by usual warrant standard of probable cause); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (municipal ordinance authorizing health department inspections of residences and imposing criminal liability for occupant's refusal to allow inspection violates fourth amendment). *See generally The Supreme Court, 1977 Term,* 92 Harv.L.Rev. 57, 210–22 (1978).

**26.** *United States v. Ramsey, supra,* 431 U.S. at 620, 97 S.Ct. at 1980.

al equivalent of the border, and we therefore adopt that phrase to describe such searches. Finally, we believe it inappropriate to refer to searches conducted within the country at points other than the first practicable detention point as "border searches" or "functional-equivalent-of-the-border" searches. Such searches do not take place at the border, nor must they necessarily be near to it. Of course part of their justification lies in the fact that a border crossing has occurred. The delay in conducting such a search until the person has removed herself from the border area or port of entry makes the eventual unexpected search more intrusive, however, and therefore compels a requirement that those conducting the search have reasonable suspicion of criminal activity. Because searches in this category have a combined rationale and are not reasonable *solely* because the border has been crossed, *compare United States v. Ramsey, supra*, 431 U.S. at 619, 97 S.Ct. at 1980, they are not border searches in the traditional sense, either. Since the "extended border search" terminology has been used primarily in the context of this kind of search, we adopt that phrase to describe such searches.

 Having attempted to distinguish the functional equivalent, extended border search, and checkpoint search doctrines, we must now consider their applicability to this case. Clearly the checkpoint search theory cannot be used to justify the search of appellants' aircraft since the location of the search was neither near the border nor a place at which stops or searches are regularly conducted. Although perhaps less obvious, under the record in this case we

conclude that the search of appellants' plane did not take place at the functional equivalent of the border. After appellants' border crossing was observed by the Air Force on its radar network, their whereabouts were tracked until Major Hoge intercepted their plane. From there Hoge followed the plane until it landed at the airport on Rock Harbor Key. Had appellants been stopped at that point, the search would have occurred at the functional equivalent of the border because Rock Harbor Key was appellants' first landing point within this country. The government witnesses' testimony indicates, however, that no attempt was made to detain appellants at Rock Harbor Key. Rather, after being on the ground for a period of five to ten minutes, the plane was allowed to depart, at which point Customs took over the air surveillance operation. The eventual search at Sugar Loaf Key occurred neither at the place of first landing within the country nor at the first practicable detention point, see text *supra* at 865, and thus cannot be considered a search at the functional equivalent of the border.[27] Having eliminated both the checkpoint and functional equivalent theories as potential bases for upholding the search of appellants' aircraft, we are left with the extended border search doctrine as the sole remaining possible rationale.

 The facts of this case fit neatly within the extended border search doctrine, which applies to searches conducted following a border crossing at points beyond the first practicable stopping point. As noted above, the extended border search doctrine

---

**27.** We do not mean to imply that the functional equivalent rationale could never be applied in a situation similar to this one. For example, if government officials attempt to stop a traveller at the first practicable point but the traveller resists detention by flight from the inspection area, a search conducted following immediate pursuit and apprehension would be justifiable as a functional-equivalent-of-the-border search because it would have been conducted at the first practicable detention point, the initial detention having been frustrated by the traveller's flight. *Cf. United States v. Woody*, 567 F.2d 1353 (5th Cir.), *cert. denied*, 436 U.S. 908, 98

S.Ct. 2241, 56 L.Ed.2d 406 (1978) (search upheld as checkpoint search with probable cause despite its occurrence a few miles from the checkpoint facility where, after Border Patrol agent detected odor of marijuana and instructed defendant to open trunk, defendant speeded away and was apprehended following high speed chase). Other conceivable situations may arise in which it is impracticable for government officials to detain a conveyance at its first domestic landing point. We hold only that the government introduced no evidence here that demonstrates such impracticability.

has three elements: the government must prove that the object searched crossed the border, that its condition remained unchanged between the time of crossing and the time of the search, and that there was reasonable suspicion at the time of the search that the object was involved in criminal activities. Here, the government's evidence established with reasonable certainty that appellants' plane had crossed the border just before Major Hoge intercepted it.[28] Moreover, continuous surveillance of the plane by Air Force and Customs officials from the time of the crossing until its second landing indicates that the contraband found on the plane must have been present before the plane landed in the United States. *See United States v. Richards, supra,* 638 F.2d at 772. Appellants' plane was on the ground after its first landing for only five to ten minutes before it took off again. It is inconceivable that 918 pounds of contraband in large boxes could have been loaded onto the aircraft during that short period without the notice of Major Hoge.[29] Finally, the totality of the circumstances known to Customs officers at the time of the search at Sugar Loaf Key constituted reasonable suspicion that appellants were involved in drug smuggling. *See id.* Appellants had entered the United States by plane without filing a flight plan or otherwise notifying the government of their intended arrival. After landing at Rock Harbor Key they remained on the ground only briefly, and during the course of their subsequent flight they jettisoned several objects from the moving plane. A package that was ejected struck the windshield of the Customs plane, and Officer Cockes observed white powder streaming out of it. He also saw what he thought were maps, a navigation computer, and money being ejected from the plane. Although appellants later testified at the suppression hearing that they were unaware they were being followed, the Customs officers could reasonably have inferred that appellants departed from Rock Harbor Key to escape apprehension and that they threw the materials from the plane in an attempt to destroy evidence of illegal activities. Appellants' subsequent landing in a remote area and their immediate flight into the nearby bushes gave Customs further reason to suspect their involvement in illegal activities. Indeed, in light of all of these facts it would be difficult to arrive at any other conclusion. For the reasons above stated, we hold Customs' search of appellants' plane was justified as an extended border search.

■ Since we uphold the government's search of appellants' aircraft as an extended border search, we need not address whether the search was justified on the ground that appellants had abandoned the plane. Appellant Garcia argues that even if the search was otherwise constitutional it was invalid because Customs lacked statutory authority to conduct such a search.[30] The government correctly points out, however, that such authority is vested in Customs by 49 U.S.C. § 1509(b) and 19 C.F.R.

**28.** See Part II.A *supra.*

**29.** Hoge testified that he circled at about 7000 feet above the airport after appellants landed. He further testified that at that distance he would have been able to discern a person deboard the plane. Although his observation of the plane was not completely uninterrupted and he was not certain that no one had left from or boarded the plane while it was on the ground, he did indicate that he observed the plane moving around for awhile and then become stationary. He also stated that there were other small planes at the airport, that only one other plane landed during the period appellants' plane was at the airport, that he observed appellants' plane prepare for takeoff, and that he was certain that the one taking off

was the one he had followed prior to its landing. This testimony indicates that Major Hoge's observation of the plane while it was at Rock Harbor Key was sufficiently careful that the major degree of activity that would have been required to load a substantial quantity of contraband onto it at that point would not have escaped his notice.

**30.** The Fifth Circuit has interpreted the Supreme Court's decision in *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977) to mean that warrantless searches conducted by government officials in the absence of statutory authority are per se unconstitutional. *United States v. Williams,* 617 F.2d 1063, 1074 (5th Cir. 1980) (en banc).

§ 6.10.[31] Hence, the search was statutorily authorized.

## III. *Other Issues*

### A. *Posse Comitatus*

■ Appellant Garcia argues that the involvement of Air Force officials in the surveillance of appellants' aircraft violates the doctrine of posse comitatus [32] as embodied in 18 U.S.C. § 1385. That statute proscribes use of the Army or Air Force "as a posse comitatus or otherwise to execute the laws" except as expressly provided by Congress. Section 1385 has been interpreted as broadly prohibiting use of such military personnel to assist civil law enforcement officials in carrying out their duties. *See,* e.g., *United States v. Red Feather,* 392 F.Supp. 916, 922 (D.S.D.1975); *United States v. Jaramillo,* 380 F.Supp. 1375, 1379–80 (D.Neb.1974), *appeal dismissed,* 510 F.2d 808 (8th Cir. 1975); *Wrynn v. United States,* 200 F.Supp. 457, 464–65 (E.D.N.Y. 1961). *But cf. United States v. McArthur,* 419 F.Supp. 186, 192–95 (D.N.D.1976), *affirmed sub. nom. United States v. Casper,* 541 F.2d 1275 (8th Cir. 1976), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977) (only exercise by military of regulatory, proscriptive, or compulsory authority is prohibited by section 1385).[33] We need not address whether the government's activities in this case in connection with appellants' apprehension violated section 1385,

**31.** 49 U.S.C. § 1509(b) authorizes the Secretary of the Treasury to designate ports of entry in the United States for civil aircraft and merchandise carried on them arriving in this country from "any place outside thereof"; to assign Customs officers and employees to such stations and confer on them "any of the powers, privileges, or duties conferred or imposed upon officers or employees of the customs service"; and to promulgate regulations applying "to civil air navigation [ ] the laws and regulations relating to the administration of the customs laws." Under the authority of this and other statutory provisions, the Treasury Department has promulgated at 19 C.F.R., pt. 6 (1981) the Air Commerce Regulations, which set forth requirements, including prior clearance and documentation, for civil aircraft landing in and departing from the United States. Section 6.10 of the regulations provides:

> Except as otherwise provided for in this part, and insofar as such laws and regulations are applicable, aircraft arriving or having arrived from any foreign port or place and the persons and merchandise, including baggage, carried thereon, shall be subject to the laws and regulations applicable to vessels arriving or having arrived from any foreign port or place, to the extent that such laws and regulations are administered by the Customs Service.

Title 19 U.S.C. § 1581 empowers Customs officers to board vessels "at any place in the United States ... and examine, inspect, and search the vessel [ ] [ ] and every part thereof and any person, trunk, package, or cargo on board." Since § 6.10 of the Air Commerce Regulations incorporates this provision by reference, it authorizes the search of aircraft to the same extent as searches of vessels are authorized under § 1581. *See also* 19 C.F.R. § 162.5 (1981) (regulation embodying language substantially identical to § 1581 but explicitly referring to aircraft).

While the authority conferred on Customs under § 1581 to search is on the face of the statute unlimited, we have construed the provision to be limited by the reasonableness requirement of the fourth amendment. *United States v. Caraballo,* 571 F.2d 975 (5th Cir. 1978). Conversely, if a search conducted pursuant to § 1581 is otherwise constitutionally valid—whether because it is based on probable cause, consent, or an exception such as the border-search doctrine—no further limitations will be read into § 1581, and thus such a search is statutorily as well as constitutionally permissible. *See id.* Since we have held that the search here was constitutionally authorized as an extended border search, and since it is covered by the statutory language of 49 U.S.C. § 1509, 19 U.S.C. § 1581, and the above-cited regulations, we now hold that Customs' search of appellants' aircraft was statutorily authorized.

**32.** Black's Law Dictionary defines posse comitatus as "The power or force of the county. The entire population of a county above the age of fifteen, which a sheriff may summon to his assistance in certain cases, as to aid him in keeping the peace, in pursuing .and arresting felons, etc."

**33.** Although for the reason stated we do not decide the issue, we note that *United States v. Wolffs,* 594 F.2d 77 (5th Cir. 1979) would have posed a substantial impediment to appellant Garcia's claim that the evidence discovered as a result of the Air Force surveillance of appellants' plane should have been suppressed. *Wolffs* held that application of the exclusionary rule to a violation of the posse comitatus statute was unwarranted in the absence of widespread violations of the act. *Id.* at 85.

however, since appellants did not raise this issue at trial.[34]

### B. Sufficiency of the Evidence

Appellant Garcia claims that the government's evidence was insufficient to sustain his conspiracy and possession convictions. Specifically, he argues that his "mere presence" in the vicinity of the landing site was inadequate to establish his possession of the contraband found on the plane and that independent evidence connecting him to the contraband should have been required.

A fundamental axiom of our jurisprudence is the rule that in criminal cases the government must prove each element of the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The standard of review for determining whether the government has met its burden is likewise a matter of universal recognition: considering the evidence and all reasonable inferences in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we must decide whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *See United States v. Davis*, 666 F.2d 195, 200 (5th Cir. 1982). The Fifth Circuit recently set out the specific elements of the government's burden in drug conspiracy cases under 21 U.S.C. § 846:

> "The essence of a conspiracy is an unlawful agreement." *United States v. Middlebrooks*, 618 F.2d 273, 278 (5th Cir.), *modified on other grounds*, 624 F.2d 36 (5th Cir.), *cert. denied*, 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 246 (1980). Ordinarily, the fundamental elements of the offense of conspiracy are an agreement between two or more persons to commit a crime and an overt act by one of them in furtherance of the agreement. *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.) (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979);
>
> *United States v. Gordon*, 580 F.2d 827, 834 (5th Cir.), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978). However, in a conspiracy prosecution under 21 U.S.C. § 846, as is involved here, the government need not prove any overt act in furtherance of the conspiracy. *United States v. Gordon*, 580 F.2d at 834; *United States v. Littrell*, 574 F.2d 828, 832 (5th Cir. 1978). Accordingly, in a prosecution under 21 U.S.C. § 846, the government must establish, beyond a reasonable doubt, that a conspiracy existed, that the defendant knew of it, and that he voluntarily participated in it. *United States v. Middlebrooks*, 618 F.2d at 278; *United States v. Littrell*, 574 F.2d at 832. The agreement between the coconspirators and the defendant need not be proved by direct evidence and may be inferred from concert of action. *United States v. Malatesta*, 590 F.2d at 1381; *United States v. King*, 532 F.2d 505, 508 (5th Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976). Further, it is not necessary for all coconspirators to know each other or to work together on every phase of the criminal venture. *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

*United States v. Wilson*, 657 F.2d 755, 758–59 (5th Cir. 1981).

Appellant Garcia contends that the government's evidence did not connect him with a conspiracy nor establish his possession of the methaqualone. He relies principally on *United States v. Rozen*, 600 F.2d 494 (5th Cir. 1979). In that case, the defendant had been convicted of conspiracy to possess marijuana with intent to distribute and possession with intent to distribute after being found asleep in the woods with his brother. The government's evidence established that defendant's two brothers had driven pickup trucks from Brunswick, Georgia to Savannah, where they checked into a motel. On the same evening, officers ob-

---

34. Under Fed.R.Crim.P. 12(b), motions to suppress evidence are required to be raised by motion prior to trial. Fed.R.Crim.P. 12(f) pro-

vides that failure to raise a defense or objection that must be made before trial "shall constitute waiver thereof."

served the trucks leave the motel together and followed the trucks to a wooded area to which there was access to boats and a dock. Thereafter, the officers lost track of the trucks until 1:30 a. m. the following morning, when they saw one of them emerge from the woods travelling at a high rate of speed. They stopped it, found it occupied by one of defendant's brothers, and discovered 1,460 pounds of baled marijuana in the back. Less than half a mile away, the officers found the other truck, also loaded with marijuana bales. A list of numbers in a notebook found in one truck and a similar list found in the wallet of a coconspirator who had been aboard the surveilled boat were presented by the government to establish a conspiracy. (The government apparently argued that the numbers reflected the weights of the marijuana bales.) After apprehending the defendant's brother and finding the two truckloads of contraband, the officers summoned state prison officials, who sent a dog handler with a bloodhound to track the missing participants. Following a scent picked up around the second truck, the dog and its handler, followed by several officers, walked (and swam) a distance of three or four miles over a four-hour period until they came upon defendant and the second brother asleep in the woods. Both were wet and scratched and the shirt of one was torn. The court held this evidence was "not enough to submit to the jury as tending to show that appellant joined in the conspiracy, or that he possessed marijuana." *Id.* at 495. the court found there was simply no evidence other than appellant's presence in the woods with his brother to connect him with the conspiracy or possession of the marijuana:

> Appellant's first, last and only appearance in the wide spectrum of activities was when he was found and arrested. Until that moment no one identified him as in the company of either of his brothers. No one saw him in either vehicle. No one saw him at the marina where the suspect boat came and went, or on or about the boat. None of his belongings were found at any place. The notebook found in the GMC was not connected to

appellant nor the writing in it shown to be his. No fingerprints connected him to vehicles, boat, or to any location. He neither rented nor bought any boat, vehicle, or motel room. No marijuana was found on him, nor any visible evidence of burlap that might have come from coverings of the bales. He was not shown to have any relationship, familial or acquaintanceship, with any one in the conspiracy beyond his relationship with Gerald and David and his presence with David when found in the woods.

> We do not speculate whether the motion for judgment of acquittal would have to be granted if there had been sufficient evidence tending to show that appellant had been in the GMC. The only evidence even tending to show appellant's presence in the truck was Clyde's pursuit of a scent from near the truck to the sleeping brothers. The only connecting factor is Clyde's nose, and no one can do any more than guess whether Clyde was following the scent of David, the scent of appellant, or the scent of both.

\* \* \* \* \* \*

> [A] jury could not infer that the scent from the vicinity of the truck to the tree where appellant and his brother were sleeping was the scent of appellant, or the scent of both men, and that it was not the scent of only David.... [Moreover, a] scent picked up at some unspecified point near the truck, even if identified as the scent of appellant, would not permit the inference that appellant had been inside the truck or in any other position where he could see the bales of marijuana within the camper body.

*Id.* at 495–97 (footnote omitted).

*United States v. Reyes,* 595 F.2d 275 (5th Cir. 1979) is close in factual setting to this case. The *Rozen* panel summarized *Reyes* as follows:

> [F]our Spanish-speaking aliens were discovered aboard an airplane, piloted by another person, that landed at the St. Petersburg-Clearwater, Florida, airport.

Circumstantial evidence tended to establish that the plane had flown in from Colombia with a load of marijuana, that the load had been ditched in the Gulf off St. Petersburg shortly before the plane landed, and that the interior of the plane had been freshly smeared with pineapple to mask the odor of marijuana. The government contended the aliens could be found to be participants in a conspiracy, and therefore guilty of possession, because one or more of them must have pushed the bales of marijuana out of the plane and smeared the plane with pineapple (while the pilot remained at the controls). We held:

> Even if we assume the correctness of the government's premises, however, there was no direct testimony that any particular defendant either ejected or helped to eject the bales or did anything to mask the odor of the erstwhile cargo. No other active role in the alleged conspiracy or in the charged importation was even intimated during the government's case.

*United States v. Rozen, supra,* 600 F.2d at 496 (quoting from *Reyes, supra,* 595 F.2d at 280).

The case before us is distinguishable from *Rozen.* In *Rozen,* the only evidence connecting the defendant with the conspiracy was his having been found in the woods with a brother who was obviously involved in the drug smuggling enterprise. While noting that his presence, under the circumstances, was "highly suspicious," 600 F.2d at 497, the court held that, in the absence of evidence sufficient to support an inference that defendant had been in the marijuana-laden truck and therefore was aware of the contraband, the reasonable doubt standard had not been met. *Id.* at 496–97 & n.2. Here the evidence showed that both Jackman and Garcia were aboard the plane, if not from the border-crossing forward, at least from the time of its departure from Rock Harbor until its landing at Sugar Loaf Key. Obviously no one boarded or deboarded the plane while it was in flight between the two landings. Moreover, there is little, if any, doubt that the men discovered by the Customs ground patrol crew in the mangrove bushes were the same two persons observed by Cockes exiting the plane after its second landing. According to Cockes' testimony, the second landing occurred in an area that was deserted; there were no buildings within miles, and no other people were visible with the exception of someone in a truck who was leaving as the plane arrived. Cockes testified that he kept the plane under close observation from the time it landed until the ground crew arrived. He further testified that he made a low pass and was only twenty to thirty feet above the plane when appellants emerged. He then observed the men enter "a fairly large, thick area of mangrove that was surrounded by open area," where they remained until Cockes left. When the ground patrol crew arrived, Cockes described to them the clothes the men were wearing and indicated the area of bush in which he had seen them go. His description was consistent with that of the men who were later found in the bushes,[35] and he testified that the men apprehended

---

**35.** Cockes testified that the men found in the bushes by the ground patrol crew were those he had seen exit the plane. Record, Vol. 2, at 80. Moreover, contrary to appellant Garcia's assertion, Cockes' description of appellants that he gave to the crew was consistent with the description related by one of the Customs officers present when appellants were found. Cockes had described the men as "[t]wo white males, one of which had a blue jean type long pants and with no shirt. The other had a, what appeared to be a casual pair of slacks, long slacks, green in color, light green with a light colored shirt, possibly white or cream." Record, Vol. 2, at 79. Customs Officer Welch testified that "[a]s I recall, Mr. Garcia didn't have a shirt on and had dark trousers on, and Mr. Jackman had on a light colored tan shirt and about, about the same colored pants, as I recall." *Id.* at 124. Government Exhibits 6–13, which are photographs of appellant Jackman taken on the day of the arrest, depict him in a pair of slacks of a neutral khaki shade that could be described as either green or tan and a shirt of a lighter color. Whatever discrepancy there is in the two Customs officers' descriptions is attributable to slight differences in their perception of color or in their expression of their perceptions. In any event the differences are insignificant.

by the ground patrol crew, whom he saw when he returned later the same day, were the same two men he had observed earlier leaving the plane. From this evidence, a jury clearly could have found beyond a reasonable doubt that appellants Jackman and Garcia were the only persons aboard the plane when it landed at Sugar Loaf Key.

The only remaining question is whether their presence on the plane is sufficient to support an inference of conspiracy to possess, and knowing possession of, the contraband discovered on board. The evidence of appellants' knowledge and intent in this case is stronger than the evidence in the *Reyes* case, and we hold it was sufficient to permit the case to be submitted to the jury. The plane in which appellants flew with the contraband was not a large one. The testimony of Customs officers and the government's photographic exhibits indicate that the nine large cardboard boxes containing the methaqualone, weighing about one hundred pounds each, occupied a substantial part of the space in the plane behind the two seats. Hence, the boxes must have been visible to both occupants of the aircraft. Although the contents of the boxes were not visible, the jury could infer appellants were aware of the nature of their cargo from their furtive acts. Customs Officer Welch, a member of the ground patrol crew who found appellants' plane at Sugar Loaf Key, testified that when he arrived the plane was parked off the roadway at the end of a road. A baggage door on the right side of the plane had been left open. A window had been removed on the left side, and this corresponds with Officer Cockes' testimony that the emergency exit on the left side of the plane came open during its flight just before he observed the various objects being jettisoned from it. The evidence thus shows that either Jackman or Garcia threw those objects out of the plane, and the size of the plane makes clear that the other must have been aware of those acts at the time. Moreover, Cockes testified that before the materials were thrown from the plane, he observed the occupants turning toward him, from which he concluded they had seen the Customs plane.[36] This is strong evidence that at least one of them had knowledge of the methaqualone and was attempting to destroy some evidence of the drug-related activities.[37] The subsequent landing of the plane in a remote area similarly supports an inference of guilt by at least one, though not necessarily both, of the occupants. The critical evidence linking *both* appellants to the illegal cargo was their joint flight after landing at Sugar Loaf Key. All the evidence indicates that appellants' acts after their landing were an attempt to evade apprehension by government authorities. The Customs plane circling above them passed within twenty to thirty feet of appellants when they were exiting the aircraft; hence, the agents' presence can hardly have escaped their notice at that point. Moreover, the jury could infer from Cockes' testimony that appellants first went to a "little clump of mangroves" but then left that area and went into "a fairly large, thick area of mangrove" that appellants were attempting to hide from the officers. Finally, it is clear that appellants' trek into the mangroves was no mere recreational outing; the bushes were so dense that in

36. Although appellants testified on the suppression motion that they were unaware they were being followed, this evidence was not before the jury.

37. As noted above, Cockes testified that some packages, one containing white powder, were thrown out, along with what appeared to him to be maps, money, and a navigation computer. Whichever of the appellants decided to discard these objects may have believed that at least by eliminating the evidence of their point of origin they could avoid conviction on an importation charge. Alternatively, they may originally have intended to remove all the evidence but found themselves unable to eject the large boxes of methaqualone from the moving airplane. In any event, the act of ejecting such objects was clearly evidence of a type the jury could consider in assessing whether appellants had the intent to commit the crimes with which they were charged. *See* 2 Wigmore, Evidence § 278, at 141 & n.6 (3d ed. 1979). *See generally* C. Wright & K. Graham, 22 Federal Practice and Procedure § 5178, at 153–59 & Supp. 46–47 (1978 & Supp. 1982); *id.* § 5240, at 476.

many areas there was not room to walk, appellants were found sitting in a "hollowed out" area that was too low to stand in, and when found both were sweating heavily and were covered with cuts and scratches on the exposed parts of their bodies. These facts were evidence of flight, from which the jury was entitled to infer that appellants knew the nature of their cargo.[38] This evidence of appellants' attempted evasion of law enforcement officers distinguishes this case from *United States v. Reyes, supra.*[39] For the reasons stated above, we hold that the jury reasonably could have found appellants conspired to possess and did possess methaqualone with intent to distribute. Hence we AFFIRM.

---

**38.** Although flight alone is insufficient evidence to sustain a conviction, *United States v. Flores,* 564 F.2d 717 (5th Cir. 1977), "evidence of flight may be relevant and a legitimate ground for the inference of guilt." *United States v. Alonzo,* 571 F.2d 1384, 1386 (5th Cir.), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). *See also United States v. Myers,* 550 F.2d 1036 (5th Cir. 1977), *appeal after remand,* 572 F.2d 506 (5th Cir.), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978).

**39.** In *Reyes* the four defendants, all illegal aliens from Colombia who spoke only Spanish, were found on board a plane with the pilot. *United States v. Reyes, supra,* 595 F.2d at 277. There was no contraband on board the plane when it landed, though the government attempted to prove it had been unloaded from the plane while flying over the Gulf of Mexico. *Id.* at 277–78. The evidence of the illegal cargo and of an alleged attempt by someone on the plane to get rid of it and mask its odor, was entirely circumstantial. *See id.* When the plane landed, Customs agents immediately approached it, ordered its occupants to get out, and searched the interior of the plane. *Id.* at 277.