UNITED STATES of America, Plaintiff,

v.

Reynaldo GORDO–MARIN, Defendant.

No. 80–264–Cr–SMA.

United States District Court,
S. D. Florida,
Miami Division.

Sept. 10, 1980.

Atlee W. Wampler, III, U. S. Atty., Miami, Fla., for plaintiff.

Theodore J. Sakowitz, Federal Public Defender, Miami, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO SUPPRESS

ARONOVITZ, District Judge.

This matter is before the Court for consideration of Defendant Reynaldo Gordo–Marin's Motion to Suppress certain tangible evidence and allegedly inculpatory statements. The Court previously referred the matter to the United States Magistrate for the purpose of conducting an evidentiary hearing and preparing a Report and Recommendation. See 28 U.S.C. § 636(b)(1). Based upon the evidence adduced at the hearing, the Magistrate recommended that the motion be denied. Defendant has filed an objection to this recommendation and has petitioned for review by this Court. The Court, having considered Defendant's motion, having conducted a hearing and

entertained argument of counsel, and having reviewed the record including the transcript of the proceeding before the Magistrate, and being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that the recommendation of the Magistrate is adopted, and the Motion to Suppress is DENIED for the reasons noted below.

The facts pertaining to the motion are not in serious dispute. During the summer of 1980, an extraordinary number of Cuban and Haitian refugees entered this country, coming ashore at various points in the Florida Keys. In response to this influx, federal immigration and border authorities set up a vehicle traffic checkpoint on highway U. S. 1, just south of Florida City on the mainland. U. S. 1 spans the length of the Florida Keys, and is the sole means of vehicle access to the mainland therefrom. At the checkpoint, which remained at a fixed location during its period of operation, all vehicles were stopped. The checkpoint operated from approximately April through June, 1980, during the height of the influx of Cuban refugees.

On the morning of June 14, 1980, Defendant's vehicle entered the checkpoint area. Upon being questioned as to his nationality, Defendant claimed to be an American citizen, and produced a birth certificate purportedly issued by the State of Texas, and other identification documents. The Defendant was then referred to a secondary inspection area, where he was questioned further. He was asked how many older brothers and sisters he had, and answered "none." The birth certificate he had produced, however, indicated that he had two older siblings. Upon being confronted with this inconsistency, the Defendant was again asked how many older brothers and sisters he had, and he replied, "I think five or six." Other questions asked by the government officers also yielded inconsistent answers.

Their suspicions aroused, the officers escorted the Defendant into a patrol car and read him his *Miranda* rights. The officers then gave the Defendant a written form

again stating his rights. One officer asked him to read the form to himself, and, upon being asked if he understood the form, the Defendant replied affirmatively. The officer further inquired as to whether the Defendant would be willing to sign the form acknowledging his understanding thereof. The Defendant agreed, and signed the form.

The officer then asked whether the Defendant was willing to answer questions, and again received an affirmative reply. The Defendant further agreed to proceed without an attorney. Upon being confronted with the numerous inconsistencies in his answers to the officers' questions, and upon being told of the officers' suspicions that Defendant was not telling the truth, the Defendant admitted that the birth certificate was not his, and that he was a Mexican citizen. It is upon the Defendant's Motion to Suppress the documents and statements to the officers that this case is before the Court.

I. Legality of the Stop and Subsequent Questioning

Relying on *United States v. Luddington*, 589 F.2d 236 (5th Cir.), *cert. denied* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 666 (1979), *United States v. Reyna*, 572 F.2d 515 (5th Cir.), *cert. denied* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 83 (1978), and *United States v. Alvarez–Gonzalez*, 561 F.2d 620 (5th Cir. 1977), the Defendant argues that the stop of his vehicle and the questioning by the officers was in violation of his Fourth Amendment rights, because the Florida City checkpoint was not the "functional equivalent" of the border.

The concept of functional equivalence comes from *Almeida–Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), where the Supreme Court stated that "[border] searches . . . may in certain circumstances take place not only at the border itself, but at its functional equivalents as well." *Id.* at 272–73, 93 S.Ct. at 2539. The Fifth Circuit has identified three factors that must be present in order for a checkpoint to be deemed the

functional equivalent of the border: "relative permanence of the checkpoint; relatively minimal interdiction by it of domestic traffic; and the checkpoint's capability to monitor portions of international traffic not otherwise controllable." *Alvarez–Gonzalez*, 561 F.2d at 621–22.

In the instant case, Defendant contends that the Florida City checkpoint fails to meet two of the requirements of the functional equivalence test. First, he argues that because the checkpoint was only existent for a relatively short period of time, it cannot be considered "permanent." Second, he contends that because the government has failed to show that a majority of the traffic passing through the checkpoint was international in origin, the second requirement is also not satisfied.

■ In resting his argument on the determination of functional equivalence, however, Defendant misconceives the applicable law. The determination of whether a checkpoint is located at a border or its functional equivalent is relevant when the government conducts a general search of the Defendant's person or vehicle. Where, as here, the governmental intrusion is limited to an inquiry concerning the Defendant's citizenship, the inquiry may be conducted at locations other than the border or its functional equivalent.

This is the holding of *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), where the Supreme Court sustained, *inter alia*, the use of a checkpoint located on Interstate 5 between San Diego and Los Angeles. That checkpoint operated in a similar manner to the one used in Florida City: all vehicles passed through the checkpoint, and some of the vehicles were singled out for a secondary inquiry. In affirming the use of such an enforcement technique, the Court stated:

Our previous cases have *recognized* that maintenance of a traffic–checking program *in the interior* is necessary because the flow of illegal aliens cannot be controlled effectively at the border. . . . These checkpoints are located on impor-

tant highways; in their absence such highways would offer illegal aliens a quick and safe route into the interior. *Id.* at 556–57, 96 S.Ct. at 3082. (emphasis added). The Court rejected the contention that the officers needed to have some articulable suspicion in order to make the stops: "[a] requirement that stops on major routes inland always be based on a reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens." *Id.* at 557, 96 S.Ct. at 3082.

The reason for distinguishing between general searches of a defendant's person or vehicle and limited inquiries as to citizenship is simply that the latter is minimally intrusive for Fourth Amendment purposes. As the Court stated in *Martinez–Fuerte*,

> [T]he potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. [Furthermore], checkpoint operations both appear to and actually involve less discretionary enforcement activity.

*Id.* at 559, 96 S.Ct. at 3083.

In *Martinez–Fuerte*, the Court also sustained the practice of referring some vehicles to secondary inspection areas, as was done in the case *sub judice.* Like the initial stop of the vehicle, the Court refused to impose any requirement of reasonable suspicion or probable cause in such referrals. "Referrals are made for the sole purpose of conducting a routine and limited inquiry into residence status that cannot feasibly be made of every motorist where the traffic is heavy. The objective intrusion of the stop and inquiry thus remains minimal." *Id.* at 560, 96 S.Ct. at 3084.

The Fifth Circuit recently relied on *Martinez–Fuerte* in *United States v. Garcia,* 616 F.2d 210 (5th Cir. 1980). In *Garcia,* the Defendant also was stopped at a traffic checkpoint and questioned concerning his citizenship. He was referred to a secondary inspection site, where, because of plain view observations by the officers, marijuana was discovered. It is noteworthy that in sustaining the stop of the vehicle and the referral to the secondary inspection site, the Fifth Circuit never referred to "functional equivalence" or the cases concerning that concept. Instead, the Court stated, "[i]t is clear that, at permanent checkpoints, stopping and questioning and referral of motorists to a secondary inspection area are permissible under the Fourth Amendment, even in the absence of any individualized suspicion, much less probable cause." *Id.* at 211.

■ It is apparent, however, that the "functional equivalence" requirements for a general search and the lesser requirements for a questioning stop have one criteria in common: the permanence of the checkpoint location. In this regard, Defendant, citing *United States v. Brigoni Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), argues that because the Florida City checkpoint was operational for a relatively short period of time, it cannot be considered permanent. The cases illustrate, however, that the "permanence" requirement refers not to the duration of the checkpoint, but to its location. This is evident from *Brigoni Ponce* and *Almeida–Sanchez,* where the lack of permanence there condemned resulted from the use of roving border patrols. These roving patrols flagged down moving vehicles without probable cause for doing so. In contrast, the checkpoint at Florida City remained at a fixed location throughout the time of its operation. The Court accordingly finds that it was a "permanent" checkpoint.[1]

---

1. In *Martinez–Fuerte*, the Court distinguished between three kinds of inland traffic checking operations: "Permanent checkpoints . . . are maintained at or near intersections of important roads leading away from the border. . . . Temporary checkpoints, which oper-ate like permanent ones, occasionally are established in other strategic locations. Finally, roving patrols are maintained to supplement the checkpoint system." 428 U.S. at 552, 96 S.Ct. at 3080. It is clear that the Florida City checkpoint is either "permanent" or "tempo-

In summary, the Court holds that when a fixed, permanent checkpoint, or a "temporary" checkpoint which operates similarly to a permanent checkpoint, is used for the purpose of determining the citizenship of those who pass through it, as here, and not for a general search of those persons or vehicles, the requirements of "functional equivalence" do not apply. Thus, the utilization of the Florida City checkpoint in this case fully complied with the requirements of the Fourth Amendment.[2]

## II. Voluntariness of Defendant's Statements and Waiver of *Miranda* Rights

■ The Defendant further contends that his statements to the officers were involuntary, and, in any event, there was no voluntary waiver of his *Miranda* rights. An examination of the record reveals that this position is untenable.

■ In determining whether the statements to the officers were voluntary the Court must consider whether the Defendant "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances around him." *Jurek v. Estelle*, 623 F.2d 929 at 937 (5th Cir. 1980). This requires the Court to weigh "the totality of the circumstances" and consider their impact on the Defendant.

Initially, the Court notes that none of the more frequent indicia of involuntariness are present in the record. The Defendant was not subject to prolonged interrogation, nor was he offered any inducement that would tend to overbear his will. Indeed, the record indicates that the officers were quite candid with the Defendant concerning the consequences of his statements if he chose to answer questions. After the Defendant had been read and had signed a waiver of his *Miranda* rights, he asked the officers what would happen to him if he told the truth. The officer candidly replied that he could be prosecuted or deported for making any statements. It was at that point that the Defendant volunteered his true identity and citizenship.

The Defendant is also no stranger to American legal proceedings and to disclosures from government agents concerning his constitutional rights. By his own statements, Defendant has previously been the subject of deportation proceedings on more than one occasion. His prior exposure to American legal proceedings further supports the Court's finding that his will was not overborne. Additionally, although the Defendant does not speak English, the record indicates that all questions to him, and the reading of his *Miranda* rights, were in Spanish.

The only factor weighing against a finding of voluntariness is the limited education of Defendant, which does not extend beyond a few months of formal education. However, the record also indicates that the Defendant can read Spanish. Indeed, at the hearing before the Magistrate, the Defendant again read, in Spanish, the *Miranda* warnings that had been given to him prior to his arrest, and acknowledged to the Court that he understood those protections. Thus, considering the totality of the circumstances, the Court finds that the Defendant's statements during the period in question were the product of his own free will, and that he was fully capable to decide to make such statements.

The record similarly does not support Defendant's contention that the waiver of Defendant's *Miranda* rights was unknowing or involuntary. Defendant not only had the opportunity to read the rights, but they were orally explained to him in Spanish. There is no suggestion that the waiver was obtained as the result of any coercion or promise of benefits from the officers. *See United States v. Martinez–Perez*, 625 F.2d 541 (5th Cir. 1980).

rary" as defined in *Martinez–Fuerte*. This Court does not perceive any constitutional distinction between the two.

**2.** The Magistrate expressly found that the Florida City checkpoint was the functional equivalent of the border. This Court does not accept or reject that finding, since the determination of that issue is unnecessary to this Court's decision, as illustrated above.

Accordingly, the Defendant's Motion to Suppress is DENIED. The Court adopts the Findings of Facts and Conclusions of Law (Report and Recommendation) of the Magistrate, except that finding pertaining to the characterization of the Florida City checkpoint as the functional equivalent of the border. As stated previously,[3] the Court finds it unnecessary to reach that issue.