Robert M. JASINSKI, Plaintiff-Appellee,

v.

R.A. ADAMS, Joe Mongiello, and United States Border Patrol, Defendants-Appellants.

No. 83–5176.

United States Court of Appeals, Eleventh Circuit.

Feb. 3, 1986.

Robert A. Rosenberg, Asst. U.S. Atty.,
Stanely Marcus, U.S. Atty., Linda Collins

Hertz, Asst. U.S. Atty., Miami, Fla., for defendants-appellants.

Alan S. Kessler, Miami Beach, Fla., for plaintiff-appellee.

Robert M. Jasinski, pro se.

## ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before HATCHETT and CLARK, Circuit Judges, and STAFFORD *, District Judge.

PER CURIAM:

Appellee Robert Jasinski brought this *Bivens* action alleging violation of Fourth Amendment rights against appellants R.A. Adams and Joseph Mongiello, and the United States Border Patrol. Adams is the Chief Border Patrol Officer of the Miami Border Patrol Sector and Mongiello is the former Immigration and Naturalization Service (INS) Regional Commissioner for the Southern Region. Mongiello had authorized a roadblock and checkpoint on U.S. Route 1, south of Florida City, Florida, on April 18, 1982. Adams was present when Jasinski was stopped that day at the roadblock for a routine citizenship check. Although the parties dispute whether any Border Patrol officer questioned Jasinski about his citizenship, all agree that Adams asked Jasinski to open his car trunk for inspection. Jasinski, a Florida attorney, refused to comply without a search warrant. After Jasinski refused twice more, Adams told Jasinski that the trunk would be opened with a crowbar unless he voluntarily opened it by key. Jasinski opened the trunk, nothing suspicious was found and he proceeded on his way. Three days later Jasinski filed suit for a preliminary injunction against further Border Patrol checkpoints in the same vicinity. He also requested compensatory and punitive damages from the individual defendants for an illegal search and seizure of his car.

Adams and Mongiello moved to dismiss the case or grant summary judgment. The order was denied on November 12, 1982, and the parties began discovery. On January 27 and 28, 1983, defendants moved again for dismissal or summary judgment. The motions were again denied on February 18, and defendants immediately filed a notice of appeal from the denial of such motions. The district court then stayed the commencement of trial on the merits pending appeal. This panel heard oral argument and on September 26, 1984, 745 F.2d 70 (1984), dismissed the appeal for lack of jurisdiction over an interlocutory order. *See* 28 U.S.C. § 1291 (appeal as of right limited to final judgments). Petitions for rehearing and rehearing en banc were similarly denied. Appellants filed a successful petition for writ of certiorari and the Supreme Court, —— U.S. ——, 105 S.Ct. 3518, 87 L.Ed.2d 646 (1985), vacated this court's dismissal of the appeal and remanded the case for further consideration in light of *Mitchell v. Forsyth*, 472 U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The Supreme Court announced in *Forsyth* that the denial of a defendant's motion for summary judgment on grounds of qualified immunity is an appealable final decision under the collateral order doctrine. *See* 472 U.S. at ——, 105 S.Ct. at 2815.

In addition to defining this court's appellate jurisdiction, *Forsyth* also outlines the scope of appellate review. This court is confined to determining whether defendants' positions as public officials shield them from "the costs of trial or ... the burdens of broad-reaching discovery." *Id.* at 2815 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982)). "Unless plaintiff alleges a violation of clearly established law," defendants are specifically entitled under the doctrine of qualified immunity to dismissal prior to the discovery phase of the case. *Id.* Defendants may still avoid the burden of trial by moving for summary

---

* Honorable William H. Stafford, Chief U.S. District Judge for Northern District of Florida, sitting by designation.

judgment after discovery has begun. Summary judgment is proper whenever discovery "fails to uncover evidence sufficient to create a genuine issue as to whether defendant in fact committed [acts in violation of clearly established law]." *Id.* While review of the denial of motions for dismissal or summary judgment is purely a legal task, we must, in the course of that review, consider all factual assertions in the complaints, affidavits and other evidence.[1] *See id.,* 102 S.Ct. at 2817. Upon reviewing these allegations, as well as current law regulating INS Border Patrol checkpoints, we conclude that the district court properly denied both motions.

### I. *Applicable Law*

 The constitutionality of a particular search and seizure[2] by Border Patrol agents depends in large part on the context in which it occurs. Legal standards developed in this area reflect due consideration of both the government's need to police border crossings and the individual's right to privacy in his person and his motor vehicle. *See, e.g., United States v. Martinez-Fuerte,* 428 U.S. 543, 546, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975). As the individual's privacy interest escalates, so too does the government's burden to justify its intrusion therein. A prior panel of this court has illustrated this proposition by summarizing the applicable standards for principal categories of border patrol search and seizure. *See United States v. Garcia,* 672 F.2d 1349 (11th Cir. 1982).

 The first category of search and seizure occurs at the border or the "functional equivalent of the border," where "there is a reasonable certainty that the object or person searched has just crossed the border,[3] there has been no time or opportunity for the object to have changed materially since the time of crossing, and the search is conducted at the earliest possible point after the border is crossed." *Id.* at 1363–64. If these conditions obtain, the search and seizure require neither a warrant nor any level of individualized suspicion. *See id.* Here, the government's need to police the border, as soon as practicable, clearly outweighs the individual interest in privacy. *See id.* at 1353–54 (quoting *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)).

 A second class of activity may be termed "extended border searches," occurring somewhere other than the earliest point after crossing the border but still "with [the Border Patrol's] reasonable certainty that a border crossing has occurred and that conditions have remained un-

---

**1.** Defendants-appellants have included in the record a hearing transcript from the case of *Hartfield v. Commissioner,* No. 82–807–CIV–CA (S.D.Fla.1982), a class action suit for a preliminary injunction or temporary restraining order to halt the INS checkpoint at Florida City. Although plaintiff-appellee Jasinski was not a member of the class, he was called as a witness, as was defendant-appellant Adams.

**2.** Despite defendant Adams' contentions to the contrary, *see* Record at 244 (answer to interrogatories), the checkpoint incident involving plaintiff was indeed a search and seizure rather than a mere "inspection." Stopping a motorist for citizenship inquiries constitutes a "seizure" for Fourth Amendment purposes. *See United States v. Martinez-Fuerte,* 428 U.S. 555, 96 S.Ct. 3075, 3082, 49 L.Ed.2d 3074 (1976). Opening a locked car trunk and removing the contents is likewise a "search." *See United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 2586, 45 L.Ed.2d 623 (1975).

**3.** This aspect of the functional equivalence test should be clarified in light of the particular facts of *Garcia.* That case involved an airplane search, almost a category within itself given the greater uncertainties of tracking flight paths rather than roadways. The portion of the test quoted above means that the evidence must establish a reasonable inference that the person or object searched has arrived in the United States from a foreign location, rather than simply having crossed and recrossed the border while en route between domestic points of origination and destination. *See United States v. Haley,* 743 F.2d 862 (11th Cir.1984) (explaining the application of the *Garcia* rule in the case of a plane which had arrived in Georgia, had just been sighted in international waters fifty air miles from the coast, yet was alleged to have been diverted from a wholly domestic flight path by bad weather).

changed from the crossing until the search." *Id.* at 1364. The lapse of time from crossing to search, however, raises a greater privacy interest than that involved in the border or functional equivalence cases. Thus, Border Patrols conducting extended border searches must have reasonable suspicion to search without warrants. *See id.*

■ Another class of search and seizure occurs at permanent checkpoints "relatively near" the border. Unlike the previous categories, checkpoint searches do not require a showing that the particular item or person searched has actually crossed the border. Rather, checkpoints are premised on the fact that patrols somewhat removed from the border are, in some cases, more effective at policing border crossings than stops at the actual border. *See Martinez-Fuerte, supra,* 96 S.Ct. at 3082. Permissible search and seizure is more restricted in this context than any other. As travelers proceed further into the interior, away from the border, their justified expectation of privacy escalates. *See Garcia, supra* at 1365 (referring to "the resumed expectation of privacy that generally accompanies one's assimilation into the mainstream of domestic activities"). Thus, the scope, duration and location of checkpoint search and seizure must be circumscribed to ensure that travelers' "rights to 'free passage without interruption'" are only minimally affected. *See Martinez-Fuerte, supra* at 3082. Border Patrol agents are authorized to stop motorists without any individualized suspicion for the limited purpose of checking citizenship. Agents may ask questions, request proof of citizenship, and conduct a purely visual (plain view) inspection of the vehicle to check for concealed illegal aliens. *See id.* Further "inspection"[4] constitutes a search and thus requires probable cause. *See United States*

*v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

These latter standards for checkpoint activity control decision of the present case since defendant neither alleges nor establishes by undisputed fact the predicate to the functional equivalence or extended border analyses. None of the agents at Florida City based their actions on a reasonable certainty that traffic had recently crossed the border.[5] Instead, defendants have justified the Florida City operation on the checkpoint rationale: policing the influx of aliens over the actual border, the Florida Keys' two hundred miles of shoreline, would be a hopeless task requiring enormous Border Patrol resources. Florida City, on the other hand, despite its distance from the shore,[6] provides a strategic and economic advantage over a border checkpoint. From there, the Border Patrol can monitor all traffic flowing north from the Keys on U.S. Route 1, just before that road divides into several routes to the interior. Since the Border Patrol relies upon the checkpoint rationale, the allegations and evidence should be measured against the legal standards of *Martinez-Fuerte* and *Ortiz:* no suspicion is necessary for a stop, but probable cause is required for a search.

## II. *Sufficiency of the Qualified Immunity Defense*

■ Under these standards for a Border Patrol checkpoint operation, an agent must have probable cause to search a car stopped for citizenship inquiries directed to the car's occupants. Plaintiff alleges a violation of this clearly established rule. He claims that upon stopping at the Florida City checkpoint, he merely inquired why he was being stopped and Border Patrol agents responded by directing him to a secondary site[7] and demanding that he

---

4. *See supra* note 2.

5. *See* Supp. Record at 93–95 (Border Patrol had not considered whether traffic was "international" rather than "domestic").

6. Florida City is approximately 18 air miles from the Florida coastline due south; 27 air miles from the city of Key Largo and 105 air miles from Key West. *See* Rand McNally Road Atlas (1985).

7. Directing a motorist to pull into a secondary or off-road inspection site requires no individu-

open his car trunk for inspection. Plaintiff contends that no agent inquired about his citizenship status before defendant Adams demanded a search of the trunk. If true, these allegations demonstrate that Adams ignored the requirement of probable cause to search the vehicle. *See United States v. Ortiz, supra.* Discovery, moreover, has produced "a genuine issue" as to whether defendant Adams conducted this search without probable cause. Border Patrol Agent Gary Hatmaker filed an affidavit supporting Adams' assertion that rather than simply questioning the checkpoint, plaintiff refused to answer citizenship questions, "continuing to yell and scream, and claim special status" as an attorney to prevent questioning and search. Record at 101 (referring to Record at 97). Both agent Hatmaker and defendant Adams assert that such "obstructionist" behavior, *see* Record at 96, constitutes probable cause to search. Given this factual dispute as to plaintiff's behavior, and the attendant legal dispute as to the existence of probable cause, the district court properly denied summary judgment relief for the defendants. Defendants' Rule 56(b) motion failed to show an absence of material disputed fact, materiality for the purpose of a *Forsyth* analysis being limited to those facts which relate to an alleged violation of clearly established law.

■ Defendant Mongiello, former INS Associate Regional Commissioner, argues that regardless of whether plaintiff states a claim against defendant Adams, plaintiff's claim against him, Mongiello, must be dismissed for failure to allege any violation by him personally. He contends that plaintiff relies solely upon the theory of respondeat superior. It is true that public officials in supervisory positions cannot be vicariously liable for their subordinates' actions, *see Robertson v. Sichel*, 127 U.S. 507, 8 S.Ct. 1286, 32 L.Ed. 203 (1888). As we understand plaintiff's case in its present posture, he does not seek relief from Mongiello on this theory. Rather, he insists that this defendant approved the check-

point site and in doing so violated clearly established law. One circuit has held that supervisory personnel can be liable for subordinates' wrongdoing in a *Bivens* action where the supervisor has "expressly or otherwise, ... participated or acquiesced in the constitutional deprivations of which complaint is made." *Kite v. Kelley*, 546 F.2d 334 (10th Cir.1976). This holding rests upon the Supreme Court's handling of supervisor liability in an analogous context, that of constitutional violations by state officials contrary to 42 U.S.C. § 1983. In *Goode v. Rizzo*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court provided that supervisory personnel could be held liable where the plaintiff demonstrates an "affirmative link" between the constitutional violation and the defendant's actions, typically through "the adoption of any plan or policy ... showing authorization or approval." *See id.* at 371, 96 S.Ct. at 604; *see also Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir.1985). Defendant Mongiello has offered no reason why a supervisor's scope of liability in a *Bivens* action should be any narrower than the scope of liability under § 1983. Indeed, he concedes as much by citing the District of Columbia Circuit's holding in *Lander v. Morton*, 518 F.2d 1084 (D.C.Cir.1975). The *Lander* court refused to summarily overturn an award against the Secretary of the Interior for damages to a subordinate caused by the Department's delay in complying with an injunction. The Secretary's liability could not be ruled out until the plaintiff had had the opportunity to show that the Secretary had "participate[d] in the decisions or activities resulting in delay." *Id.* at 1087. The clear implication is that a supervisor's participation in wrongdoing will trigger liability.

Plaintiff here alleges such participation in his complaint. Specifically, he claims that the Florida City checkpoint, selected by Mongiello, was unreasonably located, and thus, renders any search and seizure

alized suspicion. *See United States v. Garcia,* 616 F.2d 210 (5th Cir.1980).

unconstitutional by implication.[8] The Supreme Court has clearly predicated its guidelines for checkpoint stops on the reasonable location of a checkpoint. *See Martinez-Fuerte, supra* at 3085–3086 ("stops and questioning ... may be made in the absence of any individualized suspicion at *reasonably located checkpoints*") (emphasis added); ("the reasonableness of checkpoint stops turns on factors such as the location and method of operation"). The Supreme Court has provided for post-stop review of checkpoint locations, *see id.* at 3084, and has also discussed what makes a location reasonable. Even though location is a matter of administrative discretion deserving some deference, *see id.* at 3085 n. 15, reasonableness can be measured against the following factors. First, the Border Patrol's own selection criteria are important. Agents should place checkpoints where they are:

(i) [sufficiently far] from the border to avoid interference with traffic in [populated border areas], (ii) close to the confluence of two or more significant roads leading away from the border, (iii) situated in terrain that restricts vehicle passage around the checkpoint, (iv) on a stretch of highway compatible with safe operation, and (v) beyond the 25-mile zone in which "border passes," ... are valid....[9]

*Id.* at 3081 (citations omitted). Second, the reviewing court should determine that the location actually furthers the needs of law enforcement, based on evidence of the numbers of illegal aliens caught at the checkpoint or other evidence indicating that "significant numbers of illegal aliens regularly use [the road in question] at this point." *Id.* Third, the reviewing court should consider whether the location "minimize[s] interference with legitimate traffic." *Id.*

We are not aware of any case successfully challenging the location of a checkpoint, but we do believe that plaintiff alleges a violation of established standards governing location. He contends that the Florida City operation was unsafe, "has caused maximum interdiction of domestic traffic, and does not bear any reasonable relation to the monitoring of international traffic." Record at 4. Plaintiff alleges that the checkpoint was merely a "dragnet" to catch illegal aliens travelling in south Florida, regardless of their point of entry. *See id.* If true, these allegations could constitute an abuse of administrative discretion and might establish defendant Mongiello's liability. Thus, the denial of dismissal for failure to state a claim against Mongiello was proper under the standards of *Forsyth, supra.*

Denial of summary judgment after discovery was also proper since the record raises a material dispute as to whether Mongiello considered appropriate factors in selecting Florida City as a checkpoint. Evidence in the record suggests that the actual incidence of illegal entry may not have justified a checkpoint of this magnitude. Local Border Patrol agents had not provided Mongiello or any other decisionmaker with "definite numbers" on the volume of illegal entry through the Keys.[10] *See* Supp. Record at 62–63. In fact, defendant Adams admitted that the purpose of the checkpoint was to gather such information rather than to act upon it. Despite the

---

**8.** Plaintiff also alleged in his complaint that defendant Mongiello had failed to properly train Border Patrol agents operating the Florida City checkpoint, but seems to have conceded this point by noting that Mongiello's instructions for the checkpoint included a directive that searches be "based only on probable cause, consent or search warrant." Record at 186, 198 (plaintiff's request for admissions and defendant's admissions respectively).

**9.** It is not clear whether such factors as (i) and (v) apply when the border is a coastline rather than a boundary between two contiguous countries such as the United States and Mexico.

**10.** Defendant Adams and other agents sent some information about entry of illegal aliens to Mongiello prior to his authorization of the checkpoint. *See* Supp. Record at 60. Similar data was given to Adams' "immediate superior" as part of a request for a checkpoint. *See id.* at 68–69. Adams, nonetheless, denied that he had any hard data on the flow of aliens through the Keys. *See id.*

weak foundation for its suspicions, the Border Patrol did not even consider the checkpoint's impact on legitimate traffic leaving the Keys.[11] *See id.* at 91. Defendant Adams testified that the location had been selected solely for its strategic value in apprehending any illegal aliens travelling northward. *See id.* Furthermore, the record suggests that such indifference to the rights of the motoring public continued once the checkpoint opened. Local agents neither counted the number of motorists subjected to the checkpoint, nor did they try to determine if they were in fact stopping primarily international traffic. There was not even a procedure for local agents to consider whether the actual, rather than projected, operation of the checkpoint was unduly burdensome and then to make adjustments. In addition to playing havoc with traffic, the location may have been unsafe. Defendant Adams admitted that the roadblock did not allow for an emergency lane nor were there sufficient personnel to both inspect cars and monitor safety conditions in the ensuing traffic jam.[12] *See* Supp. Record at 67–68. In light of this evidence, denial of summary judgment was proper.[13]

By holding that the claims against the defendants may proceed to trial despite defendants' claim of qualified immunity, we do not intimate any finding of liability. We merely hold that the allegations and the record, thus far, raise claims of violations of clearly established law which can-

not be resolved without a trial on the merits.

The judgment below is AFFIRMED.

---

11. Defendant Adams also denied at the *Hartfield* hearing (*see* n. 1) that previous use of Florida City checkpoint was influential in the decision to open it again. In this case on appeal, defendant Mongiello argues that the reasonableness of the checkpoint was conclusively determined in a case considering that prior operation. *See United States v. Gordo-Marin,* 497 F.Supp. 432 (S.D.Fla.1980). *See also infra* note 13.

12. Plaintiff alleges that the checkpoint caused a traffic jam extending 20 miles south on U.S. Route 1. *See* Record at 4.

13. Mongiello suggests that we find the Florida City checkpoint reasonable on the basis of a decision by a prior panel of this court. *See United States v. Gordo-Marin,* 659 F.2d 58 (5th Cir.1981) (affirmed on basis of district court opinion). The implicit holding of reasonableness in *Gordo-Marin* does not control this case, however, since that court had undeniable evidence that an "extraordinary number" of illegal aliens were entering the United States through the Keys: the prior checkpoint was opened to cope with the Cuban boatlift of 1980. The Border Patrol has offered no evidence that an influx of similar magnitude existed in April 1982 when the checkpoint was reopened. Since *Gordo-Marin* is not dispositive and the evidence creates an issue regarding the reasonableness of the checkpoint, we reiterate that denial of summary judgment is proper.